# United States District Court

Southern District of New York

22-CV-02684 (CM) (SDA)

———————

**DILBUR KUKIC**,

*Petitioner,*

*- against -*

**PHIL MELECIO, Superintendent,
Walkill Correctional Facility,**

*Respondent.*

## MEMORANDUM OF LAW
### IN SUPPORT OF ANSWER OPPOSING PETITION
### FOR A WRIT OF *HABEAS CORPUS*

ALVIN L. BRAGG, JR.
District Attorney
New York County
Attorney for Respondent
One Hogan Place
New York, New York 10013
(212) 335-9000
danyappeals@dany.nyc.gov

By: Sylvia Wertheimer
SW6225
Attorney of Record

STEVEN C. WU
SYLVIA WERTHEIMER
  ASSISTANT DISTRICT ATTORNEYS
    *Of Counsel*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ............................................................................................ 1

THE EVIDENCE AT TRIAL ........................................................................... 5

    The People's Case ...................................................................................... 5

        Highly flammable natural gas is subject to extensive regulation .......................... 5

        Con Ed determines that a new gas-delivery system is needed for the renovated apartments at 121 Second Avenue, where petitioner is the general contractor .. 7

        Hrynenko rents out the 121 apartments before the authorized new gas-delivery system is ready ..................................................................................... 10

        The first unauthorized gas-delivery system for the 121 apartments .................. 11

        The deadly unauthorized gas-delivery system ......................................... 13

            A. Petitioner and Hrynenko direct creation of another unauthorized system .................................................................................... 13

            B. The unauthorized system is built and contains an inherent, dangerous flaw ......................................................................................... 14

        Restaurant employees are instructed to keep the unauthorized system secret .. 17

        March 26, 2015 brings the day of reckoning .......................................... 19

            A. Petitioner and his codefendants take additional measures to hide the unauthorized system from the visiting Con Ed employees .................... 19

            B. The piping for the authorized system fails inspection ......................... 20

            C. The unauthorized system is turned back on, causing a massive explosion ...................................................................................... 22

            D. The dead and the injured ..................................................... 25

        The investigation .................................................................... 26

Additional expert analysis ..................................................................... 28

The Defense Case ............................................................................... 31

THE DISCHARGE OF JUROR # 2 ............................................................ 33

THE VERDICT, MOTION TO SET ASIDE THE VERDICT, AND
SENTENCING ....................................................................................... 37

THE DIRECT APPEAL IN STATE COURT ................................................ 38

THE FEDERAL HABEAS PETITION ....................................................... 40

POINT I

      PETITIONER'S CLAIM THAT THE EVIDENCE WAS
      LEGALLY INSUFFICIENT TO SUPPORT HIS
      CONVICTION DOES NOT WARRANT HABEAS
      RELIEF ............................................................................... 40

            A. AEDPA provides for a highly deferential standard of review,
            and AEDPA deference applies to all aspects of petitioner's
            sufficiency claim ................................................................ 41

            B. Petitioner's legal sufficiency claim does not warrant habeas
            relief .................................................................................. 45

                  1. Petitioner cannot show that the state courts unreasonably
                  upheld the jury's finding of foreseeability ............................ 45

                  2. Petitioner's claim that the evidence was legally insufficient
                  to establish his recklessness does not provide a legitimate
                  basis for habeas relief ................................................. 57

POINT II

      PETITIONER'S CLAIM THAT THE TRIAL COURT
      IMPROPERLY DISCHARGED JUROR NUMBER TWO
      DOES NOT WARRANT HABEAS RELIEF. ....................................... 64

CONCLUSION ..................................................................................... 76

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Baldwin v. Reese*, 541 U.S. 27 (2004) ................................................................. 70

*Beck v. Washington*, 369 U.S. 541 (1962) .......................................................... 73

*Coleman v. Johnson*, 566 U.S. 650 (2012) ......................................................... 42

*Coleman v. Thompson*, 501 U.S. 722 (1991) ...................................................... 71

*Correa v. Duncan*, 172 F. Supp. 2d 378 (E.D.N.Y. 2001) ................................. 50

*Council v. Capra*, No. 14-CV-1849 (PKC) (MHD),
     2015 WL 13746663 (S.D.N.Y. Sept. 24, 2015) .......................................... 67

*Davis v. Ayala*, 576 U.S. 257 (2015) ................................................................... 42

*Edmonds v. McGinnis*, 11 F. Supp.2d 427 (S.D.N.Y. 1998) ......................... 67, 69

*Edwards v. Carpenter*, 529 U.S. 446 (2000) ..................................................... 71

*Epps v. Poole*, 687 F.3d 46 (2d Cir. 2012) ............................................... 42, 45-46

*Estelle v. McGuire*, 502 U.S. 62 (1991) .............................................................. 65

*Garbutt v. Conway*, 668 F.3d 79 (2d Cir. 2012) .............................................. 42-43

*Harrington v. Richter*, 562 U.S. 86 (2011) ..................................................... 42, 44

*Hemphill v. New York*, 142 S. Ct. 681 (2022) .................................................... 71

*Holder v. Lamanna*, No. 18-CV-7431 (PKC),
     2020 WL 804902 (E.D.N.Y. Feb. 18, 2020) ............................................ 67, 69

*Irvin v. Dowd*, 366 U.S. 717 (1961) .................................................................... 67

*Jackson v. Virginia*, 443 U.S. 307 (1979) ...................................................... 43, 45

*Johnson v. Williams*, 568 U.S. 289 (2013) ......................................................... 44

*Jones v. Murphy*, 694 F.3d 225 (2d Cir. 2012) .............................................. 70, 72

*Maldonado v. Scully*, 86 F.3d 32 (2d Cir. 1996) ................................................ 50

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ..................................................... 73

*McKinnon v. Supt. Great Meadow Correctional Facility*,
   422 Fed. Appx. 69 (2d Cir. 2011) ..................................................... 50

*Newmark v. Keyser*, No. 19-CV-3611 (BMC),
   2020 WL 4719914 (E.D.N.Y. Aug. 13, 2020) ..................................................... 65

*Nunez v. Conway*, 923 F. Supp. 2d 557 (S.D.N.Y. 2013) ................................................... 46

*Parker v. Ercole*, 666 F.3d 830 (2d Cir. 2012) ..................................................... 51

*Parker v. Matthews*, 567 U.S. 37 (2012) ..................................................... 41

*Ponnapula v. Spitzer*, 297 F.3d 172 (2d Cir. 2002) ..................................... 44-46, 53

*Quartararo v. Hanslmaier*, 186 F.3d 91 (2d Cir. 1999) ..................................................... 50

*Rehaif v. United States*, 139 S. Ct. 2191 (2019) ..................................................... 63

*Renico v. Lett*, 559 U.S. 766 (2010) ..................................................... 41

*Retallack v. Demarse*, No. 15-CV-0135 (ALC) (JCF),
   2015 WL 10682147 (S.D.N.Y. June 8, 2015) ..................................................... 65

*Sandstrom v. Montana*, 442 U.S. 510 (1979) ..................................... 60, 62-63

*Santone v. Fischer*, 689 F.3d 138 (2d Cir. 2012) ..................................................... 45

*Schlup v. Delo*, 513 U.S. 298 (1995) ..................................................... 49

*Shinn v. Ramirez*, 142 S. Ct. 1718 (2022) ..................................................... 70-71

*Smith v. Lee*, No. 12 Cv. 6215 (PGG) (HBP),
   2015 WL 5011422 (S.D.N.Y. Aug. 24, 2015) ..................................................... 50

*Snowden v. Hughes*, 321 U.S. 1 (1944) ..................................................... 73

*State of Missouri v. Lewis*, 101 U.S. 22 (1879) ..................................................... 73

*State of Ohio ex rel. Bryant v. Akron Metropolitan Dist. for Summit Co.*,
   281 U.S. 74 (1930) ..................................................... 72

*United States v. Evans*, 352 F.3d 65 (2d Cir. 2003) ..................................................... 67

*United States v. Floyd*, 496 F.2d 982 (2d Cir.),
  *cert. denied*, 419 U.S. 1069 (1974) .......................................................... 67

*United States v. Hamed*, 259 Fed. Appx. 377 (2d Cir. 2008) ............................................. 67

*United States v. Hassan*, 578 F.3d 108 (2d Cir. 2008).......................................................... 43

*United States v. Hillard*, 701 F.2d 1052 (2d Cir. 1983)........................................................ 69

*United States v. Millar*, 79 F.3d 338 (2d Cir. 1996)............................................................. 67

*White v. Woodall*, 572 U.S. 415 (2014) ................................................................................ 42

*Williams v. Taylor*, 529 U.S. 362 (2000) .............................................................................. 42

## STATE CASES

*People v. Alleyne*, 179 A.D.3d 712 (2d Dept. 2020) ........................37-38, 65, 70-71, 73-76

*People v. Congregational Khal Chaisidei Skwere*,
  232 A.D.2d 919 (3d Dept. 1996) ...................................................................... 48, 62

*People v. DaCosta*, 6 N.Y.3d 181 (2006) ............................................................................. 54

*People v. Danielson*, 9 N.Y.3d 342 (2007)........................................................................... 51

*People v. Griffin*, 98 A.D.3d 688 (2d Dept. 2012)................................................................ 34

*People v. Hernandez*, 82 N.Y.2d 309 (1993)........................................................................ 46

*People v. Jeanty*, 94 N.Y.2d 507 (2000) ........................................................................ 66, 69

*People v. Kibbe*, 35 N.Y.2d 407 (1974) ....................................................................... 39, 46-47

*People v. Knight*, 84 A.D.3d 670 (1st Dept. 2011) ............................................................... 34

*People v. Kukic*, 196 A.D.3d 169 (1st Dept. 2021) .......................................................*passim*

*People v. Kukic*, 37 N.Y.3d 1097 (2021) ............................................................................... 4

*People v. Miller*, 91 N.Y.2d 372 (1998) ............................................................................... 49

*People v. Reyes*, 75 N.Y.2d 590 (1990) ...................................................... 47, 54, 56, 59

*People v. Reynoso*, 231 A.D.2d 454 (1st Dept. 1996) ......................................................... 61

*People v. Roth*, 80 N.Y.2d 239 (1992) ...............................................................43-44, 53-55

*People v. Vazquez*, 82 A.D.3d 1273 (2d Dept. 2011)........................................................ 34

*People v. Warner-Lambert Co.*, 51 N.Y.2d 295 (1980) .........................................43-44, 53-55

### FEDERAL STATUTES AND CONSTITUTIONAL PROVISIONS

28 U.S.C. § 2254 ...........................................................................................4, 41, 76

28 U.S.C. § 2254(b)(1)(A) ................................................................................. 70

28 U.S.C. § 2254(b)(2) ...................................................................................... 71

28 U.S.C. § 2254(d)(1) ...................................................................................... 41

28 U.S.C. § 2254(e)(1) ..................................................................................51, 60

Antiterrorism and Effective Death Penalty Act of 1996.............................. 41, 43-45, 51

Rule 8(b), Rules Governing 28 U.S.C. § 2254 cases...................................................... 76

U.S. Const. amend. VI ...................................................................................66-67

U.S. Const. amend. XIV ................................................................................... 66

### STATE STATUTES

CPL § 270.35.............................................................................34, 39, 65-66, 74

CPL § 270.35(1) .......................................................................................... 39, 66

CPL § 270.35(2) .......................................................................................39, 66, 76

CPL § 330.30(1) ............................................................................................ 37

CPL § 440.10 (2)(c) ........................................................................................ 72

CPL § 490.15(5) ............................................................................................ 50

N.Y. Penal Law § 15.05(3) ................................................................................ 58

N.Y. Penal Law § 120.00(2).................................................................................. 1

N.Y. Penal Law § 120.05(4).................................................................................. 1

N.Y. Penal Law § 120.20 ........................................................................... 1

N.Y. Penal Law § 125.15(1).......................................................................... 1

## OTHER AUTHORITIES

6 N.Y. Prac., Criminal Law § 6:10 (4th ed.) ...................................................... 61

CJI2d[NY] Penal Law Art. 125.......................................................................... 46

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DILBER KUKIC,

                                        Petitioner,

            -against-                                    1:22-cv-02684(CM)(SDA)

PHIL MELECIO, Superintendent
Walkill Correctional Facility,

                                        Respondent.

# MEMORANDUM OF LAW IN SUPPORT OF ANSWER
# OPPOSING PETITION FOR A WRIT OF HABEAS CORPUS

## INTRODUCTION

This Memorandum of Law is submitted in support of Respondent's Answer opposing the petition for a writ of habeas corpus filed on behalf of petitioner Dilber Kukic. Petitioner is currently incarcerated pursuant to a judgment of the New York State Supreme Court, New York County (Michael J. Obus, J.), entered on January 17, 2020, convicting him of two counts of Manslaughter in the Second Degree (N.Y. Penal Law § 125.15[1]), nine counts of Assault in the Second Degree (N.Y. Penal Law § 120.05[4]), four counts of Assault in the Third Degree (N.Y. Penal Law § 120.00[2]), and one count of Reckless Endangerment in the Second Degree (N.Y. Penal Law § 120.20). Petitioner is serving his sentence of concurrent indeterminate prison terms of from four to twelve years on the top manslaughter counts and lesser concurrent

determinate prison terms on the other counts at Wallkill Correctional Facility, where respondent Phil Melecio is Superintendent.

On March 26, 2015, a massive explosion took place at 121 Second Avenue ("121"), fueled by gas leaking from an unauthorized system that surreptitiously powered the building's newly renovated apartments with gas diverted from the adjacent building at 119 Second Avenue ("119"). The explosion injured 13 people and killed two young men. Petitioner Dilber Kukic was the contractor for the renovation of the 121 apartments. As explained in more detail below, he played a pivotal role in secretly initiating and operating the deadly, unauthorized system.

Months earlier, Con Edison ("Con Ed") had determined that a new gas-delivery system would be needed to meet the 121 apartments' increased energy demands, and the company had approved plans for a specific system. But codefendant Maria Hrynenko, the building owner with whom petitioner had a lucrative business relationship, insisted on renting out the newly renovated 121 apartments before the authorized new system was ready. To provide gas to the new apartments right away, petitioner and Hrynenko directed a plumber, codefendant Athanasios "Jerry" Ioannidis, to create the unauthorized system to surreptitiously power those apartments by diverting gas from the adjacent 119 building, which Hrynenko also owned.

In doing so, petitioner and Hrynenko deliberately circumvented numerous safety requirements that were designed to ensure that natural gas, a highly flammable substance, would not endanger human life. Among other things, petitioner and

Hrynenko purposefully hid the makeshift system from Con Ed and the Department of Buildings, and they let Ioannidis do the work, even though he was not a licensed plumber and had previously installed another unauthorized system that had resulted in a dangerous gas leak.

The secret, makeshift system contained a fatal flaw—it dangerously connected the live gas line in 119 with uncapped meter bars in the front of the 121 basement. The uncapped meter bars in turn allowed gas to leak into the front of the 121 basement, quickly forming a flammable vapor cloud that could be ignited by even a small spark.

That foreseeable chain of events is what tragically occurred. Earlier on the fateful day, petitioner and Ioannidis restarted the unauthorized system (after a scheduled visit from Con Ed inspectors). Soon, because of the inherent flaw in the unauthorized system, gas poured through the uncapped meter bars into the front of the 121 basement. Within half an hour, the gas predictably met an ignition source and triggered a massive explosion.

On November 15, 2019, after a ten-week trial, the jury convicted petitioner as described above.[1] Petitioner appealed to the Appellate Division, First Department, which unanimously affirmed by written opinion dated June 22, 2021. *People v. Kukic*, 196

---

[1] At the same trial, codefendants Hrynenko and Ioannidis were also convicted of manslaughter, assault, and reckless endangerment. In addition, Ioannidis was also convicted of two counts of offering a false instrument for filing in the first degree.

A.D.3d 169 (1st Dept. 2021). The Court of Appeals denied leave. *People v. Kukic*, 37 N.Y.3d 1097 (2021).

Petitioner now seeks a writ of habeas corpus. *See* 28 U.S.C. § 2254. Recasting his state court claims in federal constitutional terms, petitioner claims: (1) that his convictions violate due process because the trial evidence was legally insufficient to establish that his actions foreseeably caused the explosion and that he acted recklessly, and (2) that the trial court improperly discharged a sworn juror, denying him his rights to a jury of his choice, due process, and equal protection

Petitioner's claims are meritless, and petitioner is not entitled to federal habeas corpus relief. First, the Appellate Division expressly held that the evidence satisfied the relevant elements of the charges against petitioner under New York law, and petitioner has utterly failed to show that the state court's determination was remotely unreasonable so as to meet the stringent standards for habeas relief. Petitioner seeks to improperly relitigate factual issues that are beyond the scope of habeas review, and his argument that the requisite foreseeability could not be established without proof of the nature and source of the ignition turns on the interpretation of state law, which again is not properly within a habeas court's purview. Second, the Appellate Division's holding that the trial court properly discharged the juror rested primarily on an unreviewable application of governing state law and was not an unreasonable application of federal law. To the extent petitioner now maintains that the holding conflicts with an opinion

of the Appellate Division's Second Department so as to violate his rights to due process and equal protection, the claim is unexhausted, procedurally defaulted, and meritless.

## THE EVIDENCE AT TRIAL[2]

### The People's Case

<u>Highly flammable natural gas is subject to extensive regulation.</u>

Because natural gas is a highly flammable and dangerous substance, the delivery of natural gas to buildings through pipe lines is heavily regulated by multiple government agencies (Engineer DONALD MICHAEL DOWDALL: 3552).[3] In Manhattan, natural gas is provided by Consolidated Edison ("Con Ed"), which additionally imposes many rules and regulations of its own (Con Ed Manager ANDRES VELEZ: 528-30). Compliance with all of these rules and regulations is essential to protect public safety (Velez: 530; Con Ed Employee JOHN DeLUCA: 673; Dowdall: 3552-53).

Also reflecting the danger of natural gas, Con Ed adds the odorant mercaptan to the naturally odorless, colorless, and tasteless substance so that gas leaks can be detected (*e.g.*, DeLuca: 672-73, 726; Con Ed Employee ANTHONY DIECIDUE: 1736; Con Ed

---

[2] The following recitation of the trial evidence is intended to apprise the Court of the evidence most salient to petitioner's habeas claims. A complete summary of the evidence can be found in the People's Brief to the Appellate Division, submitted as Exhibit A to respondent's Answer.

[3] Parenthetical citations are to the trial transcript. Witnesses who testified at trial are introduced with their names capitalized.

Manager FRANK McBRIEN: 2796-97). Natural gas is lighter than air and rises until it dissipates or is trapped (*e.g.*, DeLuca: 673; Detective ANDREW COHEN: 1123; ATF Fire Research Engineer MARK GRATKOWSKI: 2581; Fire Marshal PETER LINDELL: 2687; McBrien: 2796; Dowdall: 3548). When highly flammable natural gas mixes with air at certain concentrations, it can ignite and cause an explosion (*e.g.*, DeLuca: 673, 776; Diecidue: 1736-37; Gratkowski: 2582-83; Lindell: 2688). Not much is required for gas in the flammable range to ignite; even a small spark from "someone flipping a light switch" or a static discharge from touching a doorknob may be enough (Gratkowski: 2582; Engineer JAMES WESEVICH: 3000).

To initiate the process of installing gas services, a customer must submit a detailed work request to Con Ed, which reviews the submission and generates a "service determination." The determination is reflected in a "service layout letter," which details the specifics for the project, including the internal piping and related work for which the customer is responsible (Velez: 533-37; DeLuca: 673-76, 681-82).

The internal plumbing falls under the jurisdiction of the New York City Department of Buildings ("DOB"), which enforces the Fuel Gas Code, intended to promote the safe use of natural gas. A chapter of that Code deals specifically with gas piping installations (Velez: 539; DeLuca: 676; DOB Deputy Borough Commissioner JONATHAN RAINE: 1346, 1348-50, 1354). A building owner must obtain a permit for installing gas piping from the DOB, which again engages in an "extensive process" of review of the application and plans submitted to it. The DOB issues permits for the

relevant work. Among other requirements, its rules require the services of a licensed

master plumber for plumbing work.[4]

Typically, the process of preparing for and installing new gas service in a building

takes between six months and a year (Velez: 538), but given the "very, very dangerous

substance" involved, the process has been known to take as long as two years (Licensed

Master Plumber KEITH CAPPUCCIO: 3342-43). The process requires that the

contractor follow the plans submitted to and approved by the DOB (Raine: 1363-64;

Cappuccio: 3345). In addition, a contractor is required to follow Con Ed's

specifications; of particular relevance here, a contractor is not allowed to tap into an

existing gas meter or to build a gas system without Con Ed's involvement and approval

(Velez: 538-39).

<u>Con Ed determines that a new gas-delivery system is needed for the renovated</u>
<u>apartments at 121 Second Avenue, where petitioner is the general contractor.</u>

In 2013, codefendant Maria Hrynenko hired petitioner to coordinate the gut

renovation of the residential apartments at 121 Second Avenue ("121") in Manhattan.

Hrynenko owned and managed that building, as well as the building adjacent to 121 at

---

[4] A master plumber's license, which is issued by the DOB, typically requires seven years of relevant experience, as well as passage of written and practical exams (DOB Senior Licensing Attorney JONATHAN LEE: 1289-90). In addition, a master plumber must own at least 51 per cent of his company and operate his plumbing business from a physical location in one of the five boroughs (Lee: 1293-97). The license is good for three years, after which it must be renewed. Each of the approximately 1100 licensed master plumbers in New York City is given a unique license number and is issued a metal stamp or seal, which is non-transferable (Lee: 1290-91). It is unlawful for a non-licensed plumber to use a master plumber's license or seal (Lee: 1293).

119 Second Avenue ("119") (Detective LOUIS DUCCESCHI: 3961-63, 3995-96; EVELYN SERRANO [principal financial investigator, District Attorney's Office]: 4324, 4328-31; DAN TAYLOR [Department of Investigation]: 4400; PX 1986). Petitioner was registered with the DOB as a general contractor (Lee: 1299-1300) and was "the general contractor of record for 121" (Taylor: 4401).

Like the buildings on either side, 121 was a five-floor, mixed commercial and residential building. The first floor was rented to the Sushi Park restaurant, and each of the four upper floors contained single residential units (Velez: 547). There were separate entrances for the restaurant and residential units (RONALD GONZALEZ: 124-25). In addition, the restaurant received deliveries and took out garbage through metal doors in the sidewalk that opened onto stairs to the 121 basement; those doors normally were closed and locked (Restaurant Employee KYONG PIL KANG: 2371, 2411; Restaurant Employee HYUN JUN KIM: 2932-33, 2936-37).[5] The sole entrance to 119 was at 45 East 7th Street; that door was kept locked and provided access to both the apartments and basement at 119 (Gonzalez: 126; Detective ANDREW COHEN: 940-41; *see* ANGELO VASQUEZ: 1725-26, 1729, 1732-34).

On May 29, 2013, Hrynenko submitted an application to the DOB to renovate the 121 apartments (Raine: 1358-60, 1368-72; PXs 1132, 1133, 1134, 1135, 1136). The

---

[5] Defense counsel and the defense expert referred to these doors as the "Bilco doors" (e.g., Wesevich: 3212; Davis: 3853; Mohnal: 4681).

application detailed new plumbing for new appliances and contemplated putting four new gas meters for the apartments in the basement (Raine: 1361-62, 1367, 1429, 1439-41; PX 1130 [drawing of planned work]). On August 14, 2013, the DOB approved the renovation plans.[6] Subsequently, it issued work permits to petitioner, as the general contractor, and to licensed plumber Andrew Trombettas (Raine: 1375-77).[7]

On March 13, 2014, Hrynenko applied to Con Ed to add to the existing gas service at 121, and replace the existing gas meter with four new meters (Velez: 546-50, 565). Con Ed determined that the existing gas line into the building was inadequate and that it would need to install a new, larger gas line from the street into the building (Velez: 552). Con Ed then issued a "gas service layout" detailing the significant work the contractor would have to do to get the building ready for the new gas service (Velez: 554-57, 571; PXs 1226, 1227).[8] Site visits with Con Ed representatives about that work were attended, not by Trombettas, but by codefendant "Jerry" Ioannidis, who was not a licensed master plumber (*see* Velez: 559-62; Lee 1306; PX 1231).

---

[6] Although the DOB at times allowed gas to flow from one building to another, advance permission was required (Raine: 1430-31). Here, that would have entailed submitting either a new application or an amendment to the existing application for gas piping for the 121 apartments (Raine: 1431-32).

[7] DOB records showed that Trombettas was a licensed master plumber who last applied to renew his license in November 2014 (Lee: 1297-98).

[8] In its communications regarding the gas service layout, Con Ed expressly advised that "unmetered conditions" were prohibited (Velez: 555, 557-58).

By May 16, 2014, Con Ed formally authorized construction of the new, larger gas service line (Velez: 567-74). In so doing, it noted that it anticipated that the new gas service to the building might be activated within six months, by November 17, 2014 (Velez: 574).

Hrynenko rents out the 121 apartments before the authorized new gas-delivery system is ready.

Hrynenko did not want to wait so long to begin renting out the newly renovated apartments at 121. On July 11, 2014, at 10:53 a.m., Hrynenko texted petitioner that she had rented apartments 3, 4, and 5 in the 121 building for occupancy effective August 1. She did so despite knowing that Con Ed had not yet been able to install the new, larger gas line for the authorized, new gas-delivery system. Hrynenko told petitioner that she had spoken with "the restaurant owner," who had "no problem" with petitioner "hook[ing] up gas to his gas line" (Taylor: 4496-97)—a course that contravened Con Ed's regulations.

Hrynenko soon signed leases for all four renovated apartments, for monthly rentals that totaled about $24,000. Hrynenko rented the fifth-floor apartment to STEPHEN SPEACHT and three roommates for $5500 a month (Speacht: 1694-98); the fourth-floor apartment to KAREN REILY-YANCEY and three roommates for $5800 a month (Reily-Yancey: 1802-06); the third-floor apartment to SPENCER HURST and three room-mates for $6400 a month (Hurst: 3301-02); and the second-floor apartment to VIDUSH JAIPURIA and three roommates for $6200 per month

(Jaipuria: 3316-19). The leases provided that the tenants would have heat, hot water, electricity, and gas, and Hrynenko told Speacht that she would pay for the gas service "until separate meters were installed," thus acknowledging that the new gas system authorized by Con Ed had not yet been completed (Speacht: 1701; Hurst: 3303). Hrynenko used the initial payments she received from the tenants to pay petitioner's company $70,000 (Serrano: 4336-37).

The first unauthorized gas-delivery system for the 121 apartments

On the morning of August 6, 2014, Con Ed meter reader ROBERT WEISENBERGER was on his way downstairs to read the restaurant meter in the basement of the 121 building when he smelled a "strong" odor of gas (Velez: 576-77; Weisenberger: 829-30, 842-43). Con Ed employees Diecidue and McBrien discovered that flex hoses had been used to divert gas for the restaurant to the upstairs apartments (Velez: 578-81; DeLuca: 680-83; Diecidue: 1738-44; McBrien: 2797-2802; PX 1248). These easily breakable hoses were not suitable for indoor gas piping and had multiple leaks (Velez: 578; DeLuca: 680, 683-84; Diecidue: 1741, 1744-46; McBrien: 2800). The configuration was "dangerous" and "unsafe" (DeLuca: 684-85, 759; Diecidue: 1745; McBrien: 2801). Con Ed issued a "red tag" for "illegal piping," shut down the gas service to the entire 121 building, and locked the gas supply (Velez: 578-80, 586-88; Diecidue: 1746-53, 1757; McBrien: 2802).

The unmistakable inference from the evidence was that the unlicensed plumber Ioannidis had installed the flex hoses (see People's Summation: 5146). Ioannidis had

been working at 121 with petitioner from the start of the gut renovation project (*see* Pacheco: 1895). Ioannidis promptly summoned ERIC PACHECO to help address the "red tag" that Con Ed issued after discovering the flex hoses on the plumber's "job" (Pacheco: 1895-97).[9] No one disputed that Ioannidis had installed the flex hoses as part of his overall "job" performing plumbing work for the gut renovation project.

The day after Con Ed shut down gas service to the entire 121 building because of the flex hoses, the "[m]anaging agent" called Con Ed "trying to expedite" resolution of the "red tag." Velez advised the "managing agent" that what the plumber had done was "illegal" (Velez: 590-91).

On August 8, Con Ed notified Hrynenko that, before gas service could be restored to the 121 restaurant meter, a "licensed plumbing contractor" would need to "repair or replace all defective equipment" (Velez: 593-94; Con Ed Administrative Assistant KARINA REYNOSO: 1779-81). Hrynenko subsequently forwarded that notice to petitioner (see PX 3034).

---

[9] Pacheco had not been working for Ioannidis when the flexible hoses were installed as part of Ioannidis's "job" (*see* Pacheco: 1895-97).

The deadly unauthorized gas-delivery system.

A. Petitioner and Hrynenko direct creation of another unauthorized system.

Unbeknownst to Con Ed, petitioner and Hrynenko already had directed Ioannidis to provide gas service to the entire 121 building through yet other unauthorized means. Pacheco participated in that plan; he had worked extensively with Ioannidis, who had trained him to do plumbing work, and also occasionally had separately worked directly for petitioner (Pacheco: 1876, 1878, 1883-84, 1893).[10]

On the afternoon of August 6, after Con Ed shut down the gas service to 121, Pacheco and Ioannidis met with petitioner and Hrynenko in the basement of the next-door 119 building (Pacheco: 1903). The topic under discussion was finding a way to get gas from a meter in the 119 basement to the adjacent 121 building, in order to evade Con Ed's gas shutdown (Pacheco: 1904-08, 2211-13).

Together, the participants discussed adding to the existing piping in the 119 basement and bringing the new piping through the foundation wall connecting the two buildings, "across" and into a "back room" behind the partition wall in the 121 basement (Pacheco: 1878, 1907, 1952-55).[11] The meeting lasted about ten minutes and

---

[10] Pacheco was separately indicted for second-degree manslaughter for his role in the events leading to the explosion, and he testified pursuant to a cooperation agreement. He pled guilty to the manslaughter charge and faced a possible sentence of up to five to fifteen years in prison. The agreement provided that, if Pacheco cooperated and testified truthfully, the People would recommend a non-prison sentence (Pacheco: 1876-80, 2075-83).

[11] The "back room" could only be accessed from 119, because the only door to that room from the 121 basement was locked from the inside with a deadbolt (Gonzalez: 127; Pacheco: 1952-54; Kim: 2937-38).

resulted in Hrynenko agreeing to the plan (Pacheco: 1909, 1914, 2201). During the meeting, petitioner told Hrynenko that he was familiar with the work of Ioannidis and Pacheco (Pacheco: 2201-02). He also stated that the plan was their only option to provide 121 with gas service (Pacheco: 1908).

B. The unauthorized system is built and contains an inherent, dangerous flaw.

On August 8, starting early in the morning and working into the evening, Ioannidis, Pacheco, and another worker created the system discussed at the August 6 meeting, building on piping that already existed in the 119 and 121 basements (Pacheco: 1878-79, 1919-20, 1951, 2053-55).[12] The extensive new piping went through a hole they created in the buildings' common foundation wall (Pacheco: 1921-23, 1935; *see* PX 1397 [sketch of unauthorized system]). Although regulations required prior approval for alterations to more than six feet of an existing gas system, no permit had been issued for the new piping—which Ioannidis designed "off the top of [his] head" and was not installed either in accordance with the Fuel and Gas Code or pursuant to any written specifications (Pacheco: 1878, 1920, 1925-27, 2211, 2216, 2233-35).

To distribute the gas from the piping coming in from 119 to the 121 apartments, Ioannidis and his workers built a "manifold" or "header" (NYPD Arson & Explosion Detective JOHN DIMARE: 1212; Pacheco: 1925, 1937) with five branches; one branch was for the restaurant and the other four branches were connected to the four new riser

---

[12] Petitioner did not play any role in physically building the system (Pacheco: 1920).

pipes that already had been installed in the 121 back room as part of the work for the authorized new system (*see* Pacheco: 1939; PX 1397). The manifold was "set up inside the ceiling," which was left open (Pacheco: 1964). A "main shut-off" valve was installed in the piping leading to the manifold, and when that main shut-off valve was open, gas would flow into the 121 back room from 119. But the riser pipes also were connected to four longer pipes leading to the front of the 121 basement; those longer pipes were waiting to act as the conduit for the gas that would flow to the 121 apartments through the new meters that would be installed in the front of the 121 basement as part of the new gas-delivery system that Con Ed and the DOB had authorized (PX 1397). Because the authorized system was not yet operational and those new meters had not yet been installed, the meter bars at the head of the long pipes were not attached to anything and were uncapped (Cohen: 993-94, 1000-01; Pacheco: 1923).

To direct the gas coming in from 119 to the "risers," small ball valves were installed in each of the manifold branches for the 121 apartments that had been put in the ceiling of the 121 back room; those valves needed to be in the closed position to direct the gas from 119 to the riser pipes and prevent it from flowing through the long pipes into the front of the 121 basement (Cohen: 997, 1029; Pacheco: 1922-24, 1938-42, 1950-52, 2238-40). Although the ball valves came with handles to turn them on or off and to serve as indicators of whether particular valves were open or closed, Ioannidis, for unstated reasons, directed Pacheco to remove the handles (Pacheco: 1941-43, 1951, 1970, 1978, 1980, 1982, 2126-27, 2236-37).

After the unauthorized system was completed, petitioner and Michael Hrynenko, who helped his mother manage the building, went upstairs and confirmed that the 121 apartments had gas (Speacht: 1704-05; Pacheco: 1948-49).[13] At the time, Pacheco believed that the system was "safe" (Pacheco: 2057, 2128). But he also knew that there were flaws in the system, including that, if the main shut-off valve and shut-off valves in the manifold were open at the same time, gas would flow out the right side of the manifold valves, through the long pipes, out the uncapped meter bars, and into the front area of the basement (Pacheco: 1949-52).

KEITH CAPPUCCIO, a licensed master plumber, who was deemed an expert in plumbing and gas piping installation, believed that the unauthorized system was contrary to industry standards and entailed "an inherently unsafe configuration" (Cappuccio: 3388). In his view, the most significant problem was that the gas system was connected to uncapped or open meter bars—specifically, the uncapped meters in the front of the 121 basement (Cappuccio: 3387). If the main shut-off valve and the valves in the manifold all were open, gas would travel from the meter in 119 into 121 and then out of the uncapped meters in the front of the 121 basement, resulting in an "unrestrained flow of natural gas into space" (Cappuccio: 3384-87). Thus, the unauthorized system was inherently unsafe because it created "[t]he risk of having an

---

[13] Speacht did not identify petitioner, but described him as over six feet tall, muscular, and having an accent (Speacht: 1705)—which matched petitioner's appearance.

open end exposed to live pressurized natural gas" (Cappuccio: 3388; *see* Dowdall: 3569, 3582-83, 3916).

In addition, Cappuccio explained that a ball valve should not be in a concealed location in a ceiling in a locked room (Cappuccio: 3375; *see* Raine: 1423-27; Gratkowski: 2852-53). Nor did industry standards permit removing the handles from the ball valves, which made it harder to know if the valves were open or closed—a critical flaw, given that open valves on the manifold (while the main shut-off valve was also open) would lead gas to flow unimpeded into the front of the 121 basement (Cappuccio: 3378). Restaurant employees are instructed to keep the unauthorized system secret.

For a short period, the unauthorized system also was used to provide gas to the Sushi Park restaurant during the busy evening hours (KYONG PIL ("Danny") KANG [head waiter and second manager]: 2352-53, 2380-81; HYUN JUN ("June") KIM [first manager]: 2922-23, 2947, 2952).[14] Following instructions Ioannidis gave to the restaurant owner at a meeting that Hrynenko also attended, the manager would go through the 45 East 7th Street entrance down to the 119 basement and then into the back room of the 121 basement where he used a handle that had been placed inside the ceiling to turn on the restaurant's portion of the gas coming from 119 (Kang: 2380-86,

---

[14] Kim relocated to Austin Texas in January 2015, after which Kang became the manager (Kang: 2351; Kim: 2922-23).

2419-21; Kim: 2924, 2931-32, 2947-51).[15] Petitioner was present when Kim instructed Kang how to use the yellow handle to operate the system (Kang: 2386). The restaurant employees were instructed to keep the system secret (Kim: 2950).

On August 15, after receiving a self-certification affidavit dated August 11 in the name of "Andrew Trombettas" stating that the restaurant piping had been repaired and had passed an integrity test, Con Ed authorized the restoration of gas service to the 121 restaurant meter (Velez: 595-601, 604-06, 610). Thereafter, no one from the restaurant ever again accessed the 121 basement back room (Kang: 2386-87).[16]

---

[15] Hrynenko, who previously had given Kim a key for the Seventh Street entrance to 119, also gave him a key to open the door that led from the 119 basement into the 121 basement back room (Kim: 2960).

[16] At some point after gas service to the restaurant was restored, the branch of the manifold connected to the restaurant was capped (Pacheco: 1939).

March 26, 2015 brings the day of reckoning.

  A. Petitioner and his codefendants take additional measures to hide the unauthorized system from the visiting Con Ed employees.

On March 19, 2015, a Con Ed representative spoke on the phone with Ioannidis, who was masquerading as the licensed master plumber "Andrew" (Trombettas), and scheduled another site visit for March 26, 2015, at 2:00 p.m. (Velez: 638-39; Pacheco: 1959-60, 2229-30). The purpose of the visit was to do a final inspection preliminary to activating the new, authorized gas system (Velez: 641).

On March 26, Ioannidis, Pacheco, and another worker arrived at the 121 building, in Ioannidis' van, at about 12:30 p.m.—well before the scheduled 2:00 p.m. appointment with Con Ed (Pacheco: 1961-62, 1991-92; PX 4 [compilation of surveillance video from March 26]). The purpose of this advance trip was to shut off the unauthorized gas system in order to prevent Con Ed's inspectors from discovering it. Toward that end, petitioner turned off the main shut-off valve along the wall, so that no gas from 119 could flow into 121, and the 121 apartments would appear to be without gas service (Pacheco: 1970-71, 1982, 2145, 2220, 2249).

Petitioner and Ioannidis engaged in a heated argument about whether they additionally should open the valves in the manifold, which directed the flow of gas into the renovated apartments and basement (Pacheco: 1965-66, 1969). Ioannidis thought that Con Ed would be installing the new gas meters, whereas petitioner did not; the valves on the manifold had to be open for Con Ed to be able to perform the pressure

tests it required before installing new meters (Pacheco: 1965-66, 1968, 1975-76).[17]

Pacheco saw Ioannidis reach inside the ceiling, get the yellow handle left there to

manipulate the manifold valves, and then move his otherwise obscured upward-facing

hands back and forth in what Pacheco thought was an effort to get ready for the

installation of the new meters (Pacheco: 1965-68, 1982, 2143-44, 2226). Pacheco

"assume[d]" that, when he, Ioannidis, and petitioner left the basement, the manifold

valves, like the main valve, were "off"—*i.e.*, in the closed position (Pacheco: 1970, 2145,

2249). But Pacheco did not personally know that to be the case (Pacheco: 2226-27).[18]

Between 1:00 and 1:30 p.m., petitioner went to the fourth-floor apartment at 121

(Reily-Yancey: 1818-19).[19] He "fiddled with" the stove, which had been working earlier

that morning but would not turn on at the time of petitioner's visit (since the gas had

been shut off) (Reily-Yancey: 1819). Before leaving the apartment, petitioner instructed

the tenant, "[I]f anyone asks, say you never had gas here before" (Reily-Yancey: 1819).

B. The piping for the authorized system fails inspection.

---

[17] To conduct a pressure test, the entire piping system had to be at zero pressure, which could exist only if the four manifold valves were open and the main valve between 119 and 121 was shut off (Dowdall: 3608).

[18] When subsequently recovered, the four manifold valves were either substantially or fully open (Pacheco: 2227-28).

[19] The tenant did not identify petitioner at trial, but described him as a man over six feet three inches tall, "burly," with "longer curly dirty blond hair" and a European accent (Reily-Yancey: 1818, 1867).

At around 1:45 p.m., petitioner joined Ioannidis and Pacheco to greet the Con Ed inspectors, DeLuca and SANDRO GIRALDO. (DeLuca: 668-72, 677, 685-86; Giraldo: 777-83, 816; PX 4). While Pacheco remained outside, petitioner and Ioannidis led the Con Ed inspectors through the sushi restaurant down to the 121 basement where the new meters were slated to be installed (DeLuca: 688-91; Giraldo: 785-87; Pacheco: 1987-88). The inspectors found various deficiencies in the piping and pronounced the inspection failed.[20] Petitioner and Ioannidis were visibly disappointed and kept repeating that they needed the new gas meters (Velez: 643; DeLuca: 692-93, 701-02, 709, 754-56, 770-71, 774-75; Giraldo: 787-91; PX 1308).

From the basement, inspectors DeLuca and Giraldo went with petitioner upstairs to the second and third floor apartments, where Giraldo visually checked the valves and connections behind the appliances (DeLuca: 709-12; Giraldo: 791-93). So far as the inspectors knew, the apartments did not have actual gas service at that time (Giraldo: 815; *see* DeLuca: 696).

At the end of the inspection, the head of service valve for the new three-inch gas pipe service remained off and locked (DeLuca: 697; Giraldo: 788-89). The four new meter bars in the 121 basement were uncapped on both sides (Velez: 642-43; DeLuca: 697, 743, 766; Giraldo: 790; Dowdall: 3594). Under Con Ed's regulations, if the meter

---

[20] DeLuca considered the plumbing work "very poor" and "very sloppy" (DeLuca: 702).

bars were connected to a live gas source, they should have been capped to prevent gas from flowing out the wrong side of the piping (DeLuca: 697-700, 775). However, at that time, the inspectors had no reason to believe that a live gas source was attached to the open gas meter bars, since the inspectors knew that Con Ed had not yet authorized gas service for the renovated 121 apartments (Giraldo: 815, 820).

C. The unauthorized system is turned back on, causing a massive explosion.

After the Con Ed employees left, Pacheco offered to go back downstairs and "turn everything on." But petitioner said, "I got it" (Pacheco: 2000, 2175, 2232; PX 4). Thus, at 2:38 p.m., Ioannidis and Pacheco left the site (Pacheco: 2000; PX 4).

At that point, the only way to restore gas service to the 121 apartments was to open the main valve to allow gas from 119 to again flow into 121 via the unauthorized system (Dowdall: 3609, 3710). At about 2:53 p.m., petitioner entered  119, and when he emerged about three minutes later, at about 2:56 p.m., he had opened the main shut-off valve (Pacheco: 2002-03; PX 4). A return visit to the fourth-floor apartment confirmed that the gas service to the 121 apartments was back on (Reily-Yancey: 1820-22, 1847, 1849, 1862).

Sushi Park employees JOSE LAUREANO GOMEZ and LUCAS MARQUEZ were working in the restaurant kitchen at 121 when, at around 3:00 p.m., they started smelling gas (Gomez: 1516-17, 1589; Marquez: 1606-09, 1625). Marquez turned off the stove, and Gomez turned off the valve that controlled the flow of gas for all the kitchen appliances, but the smell did not stop (Gomez: 1517-18, 1586-87, 1594; Marquez: 1607-

08). Gomez perceived that the gas smell was "coming from the basement," through a door inside the restaurant's office, which opened onto a stairway leading to the 121 basement (Gomez: 1518-19, 1548-49, 1553-54, 1570, 1589).

Also at around 3:00 p.m., sushi chef MACHINDRA CHONGBANG reported an increasingly strong smell of gas to his manager, Kang (Kang: 2398, 2433; Chongbang: 2736, 2743). The smell was coming "[f]rom the basement" (Chongbang: 2737). Kang started to go down to the basement but was overcome by the gas smell, went back upstairs, and promptly notified Hrynenko, who said she would send her son (Kang: 2399, 2433-34, 2400-02, 2435).

PAOLA CARDOZA and his girlfriend SARA TAPANG were dining at a table in the front to middle of the restaurant, and TERESA GALARCE-GARCIA was sitting with her boyfriend Nicholas Figueroa at a table on the right side of the restaurant, near the sushi bar, when they saw petitioner and Michael appear and go to the back of the restaurant, where the kitchen was (Cardoza: 2288-90; Tapang: 2313-16; Kang 2400; Galarce-Garcia: 4590-95). About a minute later, petitioner and Michael wordlessly left the restaurant and ran together towards Seventh Street (Cardoza: 2290-91, 2293; Tapang: 2316-17; Galarce-Garcia: 4595-96).

Back near the kitchen, Gomez and Marquez heard a sound that Gomez described as a "very low" noise and that he was "very sure" came from downstairs (Gomez: 1519-20; Marquez: 1610). The sound was quickly followed by a "very strong" explosion,

which threw both Gomez and Marquez to the ground, as bricks and pieces of wood flew around and hit them (Gomez: 1521).

At about 3:17 p.m., Deputy Fire Chief MICHAEL McPARTLAND received the first radio transmission about the explosion and responded to the scene (McPartland: 198). Numerous firefighters, including MARLON SAHAI, Deputy Chief MATTHEW CASSIDY, and Battalion Chiefs EDWARD TIERNEY and Battalion Chief JOHN DUNNE, also responded (Sahai: 151; Cassidy: 181-82; Tierney: 326; Dunne: 1162-63). Heavy, black smoke was emanating from the Sushi Park restaurant, where a fire was burning (Sahai: 153; McPartland: 199).

The fire in the restaurant quickly intensified and spread, with flames reaching heights of 30 or 40 feet above the building (Sahai: 160; McPartland: 204). The fire also quickly spread to the building at 123 Second Avenue on the right, which was the first building to collapse (Cassidy: 193; McPartland: 204-05; Tierney: 332-33). Ultimately, all three buildings at 119, 121, and 123 Second Avenue were reduced to rubble (Cohen: 943).

After learning of the explosion, Ioannidis asked Pacheco if he remembered the position the manifold valves were in when they left the basement earlier that afternoon. Pacheco said that he had been standing too far away to see (Pacheco: 2011).

D. <u>The dead and the injured.</u>

Among those injured in the explosion and its aftermath, many seriously, were Sushi Park employees (Gomez: 1523-24; Marquez: 1615-16; Kang: 2404-06; HUGO ORTEGA REYES: 2472-75; Chongbang: 2742-43) and three of the patrons who had been dining in the restaurant when the explosion occurred (Cardoza: 2296-97; Tapang: 2319-28; Galarce-Garcia: 4599-4600). The explosion also injured people walking, driving, and standing outside the restaurant, all of whom thought at the time at the time that they were in the midst of a terrorist attack (OKSANA TISCHENKO: 2273-78; NICHOLAS VENDIKOS: 2261-69; HALEY CHEN: 2885-92). Several responding firefighters additionally suffered career-ending injuries (Tierney: 342-43; Dunne: 1180).

Three days after the fire, on March 29, 2015, the bodies of Sushi Park patron Nicholas Figueroa and Sushi Park employee Moises Locon were found in the rubble (Cohen: 954-56). The subsequent autopsy showed that Figueroa died from blunt injuries to the head and torso, together with compression of the chest and smoke inhalation (NIXON FIGUEROA: 101; Dr. JAY STAHL-HERZ: 1658-69, 1673). Locon, who had worked at Sushi Park as a busboy, also suffered smoke inhalation, and virtually every surface of his body was black and charred by fire; his identity was confirmed by DNA comparison with his three brothers (ZACHERIAS LOCON: 105-07; Stahl-Herz: 1675-83).

<u>The investigation.</u>

The New York City Fire Department's Bureau of Fire Investigation ("BFI") and the NYPD's Arson & Explosion Squad ("A&E") conducted a "joint" investigation into the explosion (Lindell:  2666). On behalf of the BFI, fire marshals ZACHARY FLETCHER and PETER LINDELL were the primary and secondary investigators (Lindell: 2658-59, 2664-65; Fletcher: 3481-82).[21] From A&E, Detectives ANDREW COHEN, JOHN DIMARE, and LOUIS DUCCESCHI were assigned to the investigation (Cohen: 925-27, 931; Dimare: 1193-97, 1202, 1273-74; Ducceschi: 3921-24).

Investigators searched petitioner's van and, among other things, found a copy of Trombettas' master plumbers license with the licensee's photograph (Ducceschi: 3936-44). But at no time between April 2014 and March 2015 had petitioner and Trombettas communicated by phone (Taylor: 4485). Additionally, phone records suggested that Trombettas had been out of the country between August 4 and August 28, 2014 (*see* NATE WEBER: 2525). When investigators subsequently went to the address for Trombettas on file with the DOB, the location was not a plumbing office but rather a

---

[21] Fletcher testified under subpoena (Fletcher: 3481). He did not want to testify because he was suffering the effects of Oxycodone that he was taking following knee surgery (Fletcher: 3480-81). The medication made his mind "very cloudy," and he remembered little about the investigation (Fletcher: 3479, 3483-85, 3510, 3512). Thus, his partner Lindell provided the bulk of the testimony about BFI's role in the investigation and the conclusion supported by that investigation.

restaurant supply warehouse (Lee: 1318; Dept. of Investigations Deputy Inspector General EDWARD ZINSER: 1333-37).

On March 31, Pacheco met with investigators and told them about the unauthorized gas delivery system (Cohen: 983-84; Pacheco: 2005-06; Ducceschi: 3974). The piping and related evidence discovered at the site already had led investigators to believe that such an unauthorized system had existed (Cohen: 982-84).

Investigators recovered a large portion—but not all—of the remnants of the unauthorized system (Cohen: 1146-47; Dimare: 1198). Among the piping recovered were the gas risers going up to the 121 apartments, all the piping leading to the meter bars in the front of the 121 basement, the meter bars themselves, and the piping from the manifold system (Cohen: 993-94, 1003, 1020-25, 1032-33; Dimare: 1211-12, 1227-28). Inspection of the manifold revealed remnants of a total of four ball shut-off valves on four branches; none of those valves had handles and all were fully or at least substantially open (Cohen: 1026, 1031, 1034-35, 1096; Dimare: 1213-14, 1214-17; Lindell: 2682; RAPHAEL TRUELSEN: 2852; Dowdall: 3600).

Investigators also found a "sheared" portion of the main shut-off valve. But notwithstanding extensive efforts, they failed to recover the main shut-off valve itself (Cohen: 1090-91, 1132-33, 1146-47; Dimare: 1263, 1278-79).

On April 13, 2015, Fire Marshal Fletcher issued a report that deemed the fire "accidental"—meaning that it had not been intentional (Lindell: 2661, 2713). Fletcher wrote that the fire originated in the first floor kitchen area "in the vapors of ignitable

gas" (Lindell: 2708; Fletcher: 3487). Although one parenthetical referred to "natural gas, from an unspecified source" (Lindell: 2710), a different entry stated that "natural gas from the basement migrated to the first floor" (Lindell: 2785-86; Fletcher: 3488). And Lindell independently concluded that the natural gas that caused the explosion when it met an unknown "heat source" came from the basement (Lindell: 2688-89, 2787).

In June 2015, investigators from A&E contacted the federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") to conduct further analysis (Gratkowski: 2572). MARK GRATKOWSKI, a fire research engineer and certified fire investigator (Gratkowski: 2561-72), reconstructed the unauthorized gas delivery system in the fire research laboratory; in addition, he conducted various tests to see how long it would take for gas to come out of the open meter bars and fill up an area the size of the front of the 121 basement so as to come within the explosive range of between five and 15 percent of the mixed gas and air (Gratkowski: 2584-91, 2598-2611; Ducceschi: 3934). The results showed that the time range within which gas would have reached the lower explosive limit was between 12.8 and 24.3 minutes (Gratkowski: 2617). That analysis was consistent with a scenario in which the unauthorized system was turned back on at between 2:53 and 2:56 p.m. and caused an explosion in the 121 basement at 3:16 p.m., 20 to 23 minutes later (Gratkowski: 2619-20).

Additional expert analysis.

Subsequently, the District Attorney's Office retained Thornton Tomasetti, among the largest structural engineering companies in the world, to perform its own

analysis of the available information and independently determine the cause of the explosion (JAMES WESEVICH: 2989-91, 3002-05). Thornton Tomasetti, in turn, retained two other companies, Gexcon and Jensen Hughes, as consultants to assist in the study (Wesevich: 3003).

Based on their studies, the Thornton Tomasetti experts concluded that the 121 basement had been the site of a "vapor cloud explosion" of natural gas that led to a "vented deflagration" (Wesevich: 3068-69, 3089; DONALD MICHAEL DOWDALL: 3550-52; Dr. SCOTT DAVIS: 3740-42, 3759; JASON SUTULA: 4095). A deflagration occurs when a flame burns at subsonic speed through a flammable vapor cloud (Davis: 3729). In a vented deflagration, a cloud of mixed gas and air travels from the ignition source like a pressure wave and expands as the gas combusts in the presence of air until the wave "reach[es] a certain velocity and just take[s] off" with tremendous force (Dowdall: 3550-52; Davis: 3806-07).

The experts further concluded that the source of the gas release that triggered the vented deflagration was open meter bars at the front of the 121 basement (Davis: 3811). They believed that the main shut-off valve between the 119 and 121 buildings had been open, leading gas to flow through the open valves in the manifold out the open meter bars into the front of the 121 basement, after which the gas mixed with air to reach an explosive concentration and was ignited by a spark that could have been generated by numerous items in the basement, including the water heater, refrigerator, and condensing unit for the walk-in freezer (Dowdall: 3600, 3610-11; Davis: 3749-50,

3767-68). The open meter bars connected to the large 119 commercial gas meter constituted the only piping capable of putting out the "massive" gas release needed for the "substantial" explosion that occurred (Dowdall: 3584, 3707, 3709; Davis: 3742, 3749-50).

In the view of expert Dowdall, the unauthorized gas delivery system came "nowhere even close" to meeting any standard of engineering or plumbing care (Dowdall: 3582-83). He concurred that having an open outlet meter bar connected to a live gas line was "dangerous" (Dowdall: 3569, 3916). Nor, given the inherent risks, did the use of the system for eight months mean that the system was "safe" (Dowdall: 3689-90).

The Thornton Tomasetti experts rejected the view that the explosion could have originated in the first floor restaurant kitchen (Wesevich: 3123, 3134-35; Dowdall: 3694-95; Davis: 3765, 3906-07; Sutula: 4134). They believed that Ariel Concosti, who reportedly said that he was in the basement on a break when the initial explosion occurred, had been "very lucky," but did not believe Concosti's account was inconsistent with the conclusion that the initial explosion occurred in the basement (Wesevich: 3156-63; Dowdall: 3544-47; Sutula: 4149). A kitchen explosion was inconsistent with the post-blast damage—most notably, the way the partition wall in the cellar was "destroyed," the way the door in the partition wall swung open, and the upward failure of the restaurant floor (Wesevich: 3123, 3135; Sutula: 4134-35). Further, the gas piping in the kitchen, both in terms of size and position, could not have

generated the large flammable volume needed to have caused the massive explosion and vented deflagration that occurred (Dowdall: 3700-03, 3708-09; Davis: 3750-55, 3757-60, 3766-67). And, the evidence that Sushi Park employees responded to the odor of gas by closing the gas valves in the kitchen only to have the gas smell remain and become even stronger also "excluded" the restaurant kitchen as the source of the gas that ignited and exploded (Dowdall: 3578-81, 3694, 3704-05; Davis: 3760-61).

## The Defense Case

The defense expert, THOMAS MOHNAL, did not have a scientific degree and was not an engineer (Mohnal: 4653, 4674, 4717, 4766-77). Before he retired, he had worked for about 30 years for the FBI, mostly in the laboratory explosives unit (Mohnal: 4653, 4655-57). None of the "explosive type cases" on which Mohnal had worked involved natural gas explosions (Mohnal: 4672, 4752, 4754, 4838-39, 4883-84, 4909).

Mohnal was of the opinion that the explosion occurred on the first floor of 121, in the area of the restaurant's kitchen, and that the source of the natural gas was a leak or "some type of failure" in that area from a gas pipe or valve that "had something to do with the cooking apparatus" (Mohnal: 4679-80, 4741-42, 4789-90, 4806, 4812, 4890). In reaching that opinion, Mohnal was heavily influenced by Fletcher's determination that the explosion originated on the first floor of 121, in the area of the kitchen, and that the explosion was accidental and from "an unspecified source" (Mohnal: 4676-77, 4892). Although Fletcher's report also stated that the natural gas had "migrated from the basement to the first floor," Mohnal did not agree with that part of the report

(Mohnal: 4860-61). Mohnal noted that witnesses testified that they had smelled gas in, and heard a hissing sound coming from, the kitchen area (Mohnal: 4678-79, 4687-88, 4742, 4891, 4901). He also believed that witnesses testified that they had smelled gas over ten minutes before the time when, according to the People's theory, the main valve in the basement had been turned on (Mohnal: 4686-88, 4742, 4810, 4894, 4901-02, 4908).

Mohnal did not agree with Thornton Thomasetti's opinion that the explosion occurred in the basement or cellar area of 121 (Mohnal: 4678, 4708). Among other things, he reasoned that, given the "amount of force that's evident from the surveillance video," had the explosion occurred in the basement, it would have been "mathematically impossible" for the blast wave to have "come out of the front" of the building without the "Bilco doors" that led from the basement to the sidewalk first having "blasted open" (Mohnal: 4681-84, 4692-93, 4695-96, 4698, 4702, 4705-06, 4768, 4863, 4890-91; DX MM [video]). Mohnal also cited what he deemed the lack of physical damage in the basement to items such as the water heater in the corner of the basement (Mohnal: 4681, 4683, 4706-07, 4863; PX 433 [photograph]).

At the same time, Mohnal could not explain what would have led to a leak or failure in the pipes or gas valves in the kitchen (Mohnal: 4808-10, 4886-87). Nor could he reconcile the theory of a kitchen gas leak with the testimony that four witnesses smelled "gas from the basement" before the explosion; since gas rises, a gas smell in

the basement would have been inconsistent with a kitchen gas leak (Mohnal: 4795-96, 4829, 4833, 4861).

Mohnal did not consider the open meter bars or the unauthorized gas system because the video "clearly showed" that the explosion happened on the first floor and not in the basement (Mohnal: 4786-87, 4887). He was not aware that any of the defendants had opened and closed valves on the unauthorized system in preparation for the earlier Con Ed inspection (Mohnal: 4789). Mohnal did not agree with the People's expert testimony that a "pretty big volume" of gas would be needed to cause an explosion of the size that occurred here (Mohnal: 4803).

## THE DISCHARGE OF JUROR # 2

On October 24, 2019, almost two months into the trial, juror number two informed the court that a job examination crucial to her career was scheduled for that coming Tuesday, October 29, 2019, in Albany (4196). The juror already had rescheduled the relevant "correction officer test" once, at the court's request (*see* 2449-55), and could not reschedule it again (4199). Because of the out-of-town location, the juror would be unavailable for an entire day of scheduled testimony (4197-98).

The prosecutor stated that the juror should be excused, but petitioner's counsel opposed excusing the juror (4200). The trial judge commented that he did not want to "give up the day," especially since they were approaching a previously-scheduled week long break in the testimony (4201), which would start at lunchtime on October 30 and continue until November 7 (*see* Exhibit ([Exh."] E, p. 2); the judge noted that the jurors

had been told that the trial would conclude by the week before Thanksgiving at the latest, and opined that it therefore would be "appropriate," if possible, to complete the People's case before the recess so that "what remains is the defense case and then there is a long weekend after that" (4201). The judge also observed that juror number two "certainly w[ould] not be available for more than the two hours that is the minimum" required under New York CPL 270.35 to excuse a juror (*id.*).

Kukic's attorney argued that CPL 270.35 did not apply. He maintained that the "two hour rule" applied only when a juror was "missing in action" for two hours, with "no indication when the juror is going to be back" (4368). Counsel also asserted that there was a "distinction" between the 12 "principal" jurors and the alternate jurors, and that the relevant juror was "our choice rather than an alternate" (4368-69).

The judge stated that CPL 270.35 applied "where a juror is unavailable for service for more than two hours" for any reason, not only when the juror "fails to appear" (4373-74).[22] He further concluded that his "broad discretion" under the statute supported discharging the juror. The judge commented that they had "less and less room to maneuver" as they approached the "back end of [their] anticipated schedule," and stated that they had to consider the "interests of the other jurors in keeping the matter on schedule" (4374).

---

[22] The court cited, as examples, the opinions in *People v. Griffin*, 98 A.D.3d 688 (2d Dept. 2012); *People v. Knight*, 84 A.D.3d 670 (1st Dept. 2011); and *People v. Vazquez*, 82 A.D.3d 1273 (2d Dept. 2011) (4373-74).

The judge elaborated that he understood that the witness scheduled to follow the current witness would take "substantial time" and could conclude his testimony on Wednesday morning if necessary (4374). He expressed his hope that, if the People completed their case before the recess, the defense expert could be scheduled for November 7, the day the trial would resume. The judge noted that there would be a three-day weekend after the trial resumed, followed, even if the evidence had been completed, by four summations, jury instructions, and deliberations. Thus, the judge determined, it was "highly appropriate under the circumstances not to give up . . . a full court day with the jury" (4375).

After the judge's ruling, juror number two was excused (4375-76). The first alternate was seated in her place (4378-79).

<u>JURY INSTRUCTIONS</u>

In its final instructions, the trial judge discussed the "concept of causation of death or injury," which, he explained, "applie[d] to all the homicide and the assault counts" (5260). The judge stated that conduct constituted "a sufficiently direct cause of death or injury" when two requirements were met: (1) "the conduct [wa]s an actual contributory cause of the death or injury," and (2) the death or injury was a reasonably foreseeable result of that conduct" (*id.*). With respect to the second requirement, the judge instructed: "Death or injury is a reasonably foreseeable result of a person's conduct when the death or injury should have been foreseen as being reasonably related to the actor's conduct" (5261).

The instructions continued:

> It is not required that the death or injury was the inevitable result or even the most likely result, and it is not required that the actor have intended to cause the death or injury.

> I further advise you that if there was an intervening act between a defendant's conduct and a death or injury, liability for that death or injury turns upon whether the intervening act is a normal or foreseeable consequence of the defendant's conduct

(5262).

The discussion concluded:

> And finally, in this regard, I advise you it would not be enough for the People to show that given the conditions existing at the scene, an explosion causing death or injury was foreseeable. Instead, the People are required to show that it was foreseeable that the explosion would occur in the manner that it did

(*id.*).

The judge also instructed the jury on the concept of recklessness, as follows:

> A person . . . acts recklessly with respect to a death, when that person engages in conduct which creates or contributes to a substantial and unjustifiable risk that another person's death will occur, and when he or she is aware of and consciously disregards that risk, and when that risk is of such nature and degree that disregard of it constitutes a gross deviation from the standard of care that a reasonable person would observe in this situation.

> The question naturally arises how to determine whether a person had the knowledge, that is the awareness required for the commission of this crime.

> To make that determination, you must decide if the required knowledge or awareness can be inferred beyond a reasonable doubt from the proven facts.
>
> In doing so, you may consider the person's conduct and all of the circumstances surrounding that conduct, including, but not limited to, what if anything did that person do or say

(5264).

## THE VERDICT, MOTION TO SET ASIDE THE VERDICT, AND SENTENCING

On November 15, 2019, after a ten-week trial, the jury convicted petitioner and his co-defendants of two counts of reckless manslaughter, as well as of all the indicted assault counts and reckless endangerment.[23]

By letter dated January 14, 2020, petitioner moved to set aside the verdict, pursuant to New York CPL 330.30(1); petitioner claimed that the trial court had abused its discretion when it discharged juror number two, and cited the then-recent Second Department opinion in *People v. Alleyne*, 179 A.D.3d 712 (2d Dept. 2020) (Exhs. F, G).

At the start of the scheduled sentencing proceedings, on January 17, 2020, the trial judge denied the motion to set aside the verdict. The judge stated that, even assuming that *Alleyne* was correctly decided, the two cases were "significantly different" (S: 5-6).[24] Unlike in *Alleyne*, the judge noted, "[N]o constitutional issue was raised here" (S: 7). Further, the judge continued, the statute conferred "concededly broad

---

[23] The manslaughter convictions meant that the jury never reached the lesser, alternative charges of criminally negligent homicide.

[24] References preceded by "S" are to the minutes of the sentencing proceedings.

discretion," the exercise of which needed to be evaluated "under the particular circumstances of this case" (*id.*). Those circumstances, he noted, included "a particularly long and complicated trial," with a schedule that had been "set and agreed to long before the trial commenced" (*id.*). The judge stated that he continued to believe he had properly exercised his discretion when he "decided that the trial should proceed . . . with the alternate juror in whose selection the defendants had all participated" (S: 9).

The trial court then sentenced petitioner to concurrent indeterminate prison terms of from four to twelve years on the manslaughter counts and to lesser concurrent determinate sentences on the other counts.

## THE DIRECT APPEAL IN STATE COURT

Petitioner appealed his conviction to the Appellate Division, filing a joint 133-page brief with co-defendant Hrynenko (Exh. B). Petitioner raised three claims: (1) that the evidence was legally insufficient to support his conviction; (2) that the verdict was against the weight of the evidence; and (3) that the trial court improperly dismissed juror number two.

On June 22, 2021, the Appellate Division unanimously affirmed petitioner's and Hrynenko's convictions. Applying "the well established principles pertaining to legal sufficiency and weight of the evidence review," the Appellate Division held that "no reason" existed to disturb the verdicts. 196 A.D.3d at 175. The Appellate Division reviewed the statutory definition of recklessness and additionally noted that, to satisfy the element that the defendants "caused" a death, the evidence needed to show that

"the death 'was something which should have been foreseen as being reasonably related to [defendants'] acts'." *Id.*, quoting *People v. Kibbe*, 35 N.Y.2d 407, 412 (1974).

The Court then concluded that "the evidence was legally sufficient to prove that defendants recklessly caused the victims' deaths when they deliberately circumvented safety regulations to create and operate the unauthorized system." *Id.* First, the Court found that, "[c]ontrary to defendants' primary argument, the explosion was a foreseeable result of their actions," since "[t]here was ample evidence that defendants, who both had ample experience with buildings and the relevant DOB and Con Ed regulations, understood the risk that death would occur when they proceeded with building and operating the unauthorized gas delivery system." *Id.* at 175-76. The Appellate Division specifically rejected as "unavailing" petitioner's claim that he had reasonably relied on Pacheco's assurances that the system was safe. *Id.* at 176.

In addition, the Appellate Division concluded that the verdicts were not against the weight of the evidence. *Id.* The opinion explicitly stated that the jury could reasonably have decided to credit the testimony of the People's experts over that of the defense expert. *Id.*

As for the challenge to the discharge of juror number two, the Appellate Division cited to New York CPL 270.35(1) and (2) and determined that the trial court "providently exercised its discretion in replacing a juror with an alternate after a sufficient inquiry into the juror's unavailability." *Id.* at 176-77.

Petitioner and Hrynenko jointly sought leave to appeal to the New York Court of Appeals, submitting complementary letters dated July 19, 2021, an additional letter dated July 25, 2021, and reply letters (Exhs. H, I, J, L, M). On November 10, 2021, the Honorable Anthony Cannataro denied petitioner's leave application. Petitioner did not seek further review from the United States Supreme Court.

THE FEDERAL HABEAS PETITION

Petitioner now asks this Court to issue a writ of habeas corpus. He reprises the claims he raised on his direct appeal to the state courts that: (1) the trial evidence was legally insufficient to establish his guilt, because it did not properly establish either the foreseeability required to prove causation or the recklessness required to prove his mental culpability; and (2) the trial court improperly discharged juror number two. For the reasons explained below, petitioner's claims do not warrant habeas relief.

POINT I

PETITIONER'S CLAIM THAT THE EVIDENCE WAS LEGALLY INSUFFICIENT TO SUPPORT HIS CONVICTION DOES NOT WARRANT HABEAS RELIEF.

With its guilty verdict, the jury at the state court trial found that the gas leak that led to the catastrophic explosion at 121 resulted from the unauthorized system that surreptitiously powered the newly renovated 121 apartments with gas diverted from the adjacent building at 119, and that petitioner, by playing a pivotal role in initiating and

operating that system, recklessly and foreseeably caused the resulting injuries and death. In affirming the conviction, the Appellate Division concluded that the jury's verdict comported with the weight of the evidence and was supported by legally sufficient evidence of foreseeability and recklessness. In particular, the Appellate Division concluded that the explosion was "a foreseeable result of [petitioner's] actions" and that petitioner acted recklessly when he "deliberately circumvented safety regulations to create and operate" the "dangerous makeshift system." *Kukic*, 196 A.D.3d at 175-76. Petitioner's efforts to relitigate those findings and determinations in this habeas proceeding fail to provide any legitimate basis for relief.

## A. AEDPA provides for a highly deferential standard of review, and AEDPA deference applies to all aspects of petitioner's sufficiency claim.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "proscribes[ ] 'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts'." *Parker v. Matthews*, 567 U.S. 37, 38 (2012), quoting *Renico v. Lett*, 559 U.S. 766, 779 (2010). Under 28 U.S.C. § 2254, a federal court must defer to the state court's determination of any matter "adjudicated on the merits," unless the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(1).

"Clearly established Federal law" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014). A state court decision is "contrary to" Supreme Court precedent if "the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court decision involves "an unreasonable application of" Supreme Court precedent "if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

Significantly, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011), quoting *Williams*, 529 U.S. at 410 (emphasis in the original). To constitute an "unreasonable application" of Supreme Court holdings, the application must rise to the level of being "objectively unreasonable, not merely wrong; even 'clear error' will not suffice." *Woodall*, 572 U.S. at 419. Put another way, habeas relief may be granted only when "no fairminded jurist could agree with the state court's application" of federal law. *Davis v. Ayala*, 576 U.S. 257, 277 (2015).

Moreover, a petitioner's challenge to the sufficiency of the evidence supporting his state-court conviction is subject to a "doubly deferential" standard of review. *Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012); *Garbutt v. Conway*, 668 F.3d 79, 81 (2d Cir. 2012); *see Coleman v. Johnson*, 566 U.S. 650, 651 (2012). As an initial matter, the sufficiency

standard is itself "exceedingly deferential." *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008). Under that standard, the evidence must be viewed in the light most favorable to the prosecution; so viewed, the jury's verdict must be upheld so long as "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original). And when, as here, a state court has already upheld the sufficiency of a jury verdict, that state judicial determination is separately subject to deference as well. "Thus, where the state courts have denied a claim of insufficient evidence on the merits, [a federal habeas court] may not grant the writ unless [it] conclude[s] that no reasonable court could have held that any reasonable jury could have read the evidence to establish petitioner's guilt beyond a reasonable doubt." *Garbutt*, 668 F.3d at 81-82.

Petitioner wrongly maintains that AEDPA "deference is not . . . required as to th[e] [foreseeability] element" of his convictions "since the Appellate Division did not address it" (Attorney's Declaration in Support of Habeas Petition ["Decl."]: 91; *see id.*: 87). In fact, the Appellate Division opinion expressly addressed that issue—and decided it adversely to petitioner—when it stated, "Contrary to defendants' primary argument, the explosion was a foreseeable result of their actions." *Kukic*, 196 A.D.3d at 175-76.

To the extent petitioner is complaining, as he did in his unsuccessful leave application to the New York Court of Appeals, that the Appellate Division opinion failed to mention the opinions in *People v. Warner-Lambert Co.*, 51 N.Y.2d 295 (1980), and *People v. Roth*, 80 N.Y.2d 239 (1992), on which his foreseeability argument has always

heavily relied, AEDPA deference does not depend on the way a state court opinion is written. Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'." *Richter*, 562 U.S. at 100. "While it is preferable for an appellate court in a criminal case to list all of the arguments that the court recognizes as having been properly presented, … federal courts have no authority to impose mandatory opinion-writing standards on state courts." *Johnson v. Williams*, 568 U.S. 289, 300 (2013). Thus, the Appellate Division did not need to explain why it rejected petitioner's specific arguments on the foreseeability issue for its conclusion that the explosion "was a foreseeable result of [petitioner's] actions," *Kukic*, 196 A.D.3d at 175-76, to constitute an adjudication "on the merits" entitled to AEDPA deference.

In any event, context demonstrates that the Appellate Division both considered and rejected petitioner's arguments based on *Warner-Lambert* and *Roth*. In the briefs submitted to the Appellate Division, "both parties vigorously argued," *Ponnapula v. Spitzer*, 297 F.3d 172, 181 (2d Cir. 2002), whether the decisions in *Warner-Lambert* and *Roth* controlled the foreseeability analysis. *See* Exh B, pp. 69-72, 74-87; Exh. A, pp. 84-88. Although the Appellate Division did not expressly reference those cases, it cast its determination that "the explosion was a foreseeable result of [petitioner's and Hrynenko's] actions" as a rejection of "defendants' primary argument." *Kukic*, 196 A.D.3d at 175-76. Given how heavily petitioner had relied on *Warner-Lambert* and *Roth*, that characterization plainly signified that the state court had "adjudicated, and rejected,

[petitioner's] claim" that those decisions were controlling. *Ponnapula*, 297 F.3d at 182. AEDPA deference thus applies.

Accordingly, all aspects of petitioner's current sufficiency claim were "adjudicated on the merits" in the state appellate court and are entitled to deference in this habeas proceeding.

B. Petitioner's legal sufficiency claim does not warrant habeas relief.

Petitioner disputes the sufficiency of the evidence regarding both foreseeability and recklessness. The Appellate Division emphatically rejected petitioner's arguments challenging the jury's verdict on these grounds, and the New York Court of Appeals declined to further review the matter. Petitioner has utterly failed to show that the Appellate Division's holding—which appropriately found that the facts satisfied the elements of the charges against him under New York law—was remotely unreasonable so as to satisfy AEDPA's stringent standards.

1. Petitioner cannot show that the state courts unreasonably upheld the jury's finding of foreseeability.

The federal constitutional right of due process "does not dictate to the state courts precisely how to interpret their own criminal statutes." *Ponnapula*, 297 F.3d at 182; *see Santone v. Fischer*, 689 F.3d 138, 148-49 (2d Cir. 2012). A habeas court's "concern is not with the state courts' application of the state law defining the offense, but rather with the state courts' application of federal law, and, in particular, the sufficiency standard set forth by the Supreme Court in *Jackson*." *Epps*, 687 F.3d at 50. Thus,

"[w]hich acts constitute the elements of a state crime is a question generally answerable only by the state legislature and state courts," and that determination "is antecedent to the constitutional requirement that the government prove those elements beyond a reasonable doubt." *Ponnapula*, 297 F.3d at 182. Moreover, "federal courts should be particularly deferential to state courts when interpreting the sufficiency of the evidence to satisfy the elements of a complex and evolving body of state law." *Nunez v. Conway*, 923 F. Supp. 2d 557, 567 (S.D.N.Y. 2013), citing *Epps*, 687 F.3d at 50.

Here, the Appellate Division's holding that the trial evidence sufficiently established the foreseeability of the explosion comported with bedrock state law principles pertaining to the foreseeability requirement. Under New York law, a defendant's wrongful conduct constitutes a "sufficiently direct cause" of harm to warrant the imposition of criminal liability, when "the ultimate harm is something which should have been foreseen as being reasonably related to the acts of the accused." *Kibbe*, 35 N.Y.2d at 412. The requisite foreseeability does not require that the defendant intended to cause the ultimate harm. *Id.* Nor need the victim's death have constituted "the most likely" result of the defendant's conduct. *People v. Hernandez*, 82 N.Y.2d 309, 319 (1993). And, when death was due in part to a supervening or intervening event, the analysis turns on whether that intervening event was foreseeable. *See Kibbe*, 35 N.Y.2d at 413; CJI2d[NY] Penal Law Art. 125, Cause of Death. Here, the gas leak that fed the deadly explosion was the foreseeable result of petitioner's wrongful conduct in promoting, initiating, and operating the unauthorized, inherently flawed gas-delivery

system; and, the ignition of the leaked gas by a small spark generated in the course of the normal operations in the busy 121 basement, *see* p. 50, *infra*, was a foreseeable intervening event.

The circumstances giving rise to the danger of deadly harm were analogous to those in *People v. Reyes*, 75 N.Y.2d 590, 592 (1990), where the Court of Appeals upheld a reckless manslaughter charge against a building owner for a fire that killed one tenant. The building in *Reyes* "had been renovated without permit and converted from an approved commercial office space to a nonapproved single-room occupancy (SRO) dwelling"; the resulting Building Code violations included electrical deficiencies that caused the deadly fire. *Id.* The Court determined that "[i]t was reasonably foreseeable that the creation and continuance of the dangerous conditions presented a substantial and unjustifiable risk of death or injury in a fire." *Id.* at 593. Here, too, the harm of a deadly explosion and fire from a gas leak caused by dangerous conditions petitioner and his co-defendants created when they decided to surreptitiously build and operate the unauthorized system without any regulatory review "should have been foreseen as being reasonably related" to petitioner's actions. *Kibbe*, 35 N.Y.2d at 412.

After all, the possibility that simultaneously open valves on the piping leading to the manifold and the manifold piping itself would cause gas to flow into the front of the 121 basement was the precise risk that Pacheco recognized from the start as constituting a "flaw" in the unauthorized system and that the People's experts testified made that system inherently dangerous. As the testimony established, no properly

designed system—let alone one that would withstand regulatory scrutiny—would so easily allow gas to flow unimpeded into an enclosed indoor space. Yet the unauthorized system that petitioner championed and helped put in place contained this inherent vulnerability.

Moreover, harm is foreseeable when it results from "unsafe conditions that would have been uncovered by a timely inspection" that a defendant prevented from taking place. *People v. Congregational Khal Chaisidei Skwere*, 232 A.D.2d 919, 921 (3d Dept. 1996). Here, the regulatory review that petitioner assisted in purposefully evading would have uncovered the danger created by connecting the live gas line in 119 with uncapped meter bars in the front of the 121 basement; Con Ed regulations required that meter bars connected to a live gas source be capped. Similarly, Con Ed regulations prohibited removing the handles from ball valves in gas piping—a configuration that made it difficult to tell if the valves were open or closed, increasing the risk that the valves would inadvertently be left open, as happened here with the ball valves on the manifold. Accordingly, the terrible explosion at 121 also was the foreseeable result of petitioner's decision to create and operate the jerry-rigged gas-delivery system without the mandated regulatory review. *See Congregational Khal Chaisidei Skwere*, 232 A.D.2d at 921 (where the defendant kept a car from getting inspected, as legally required, it was foreseeable that a car accident would result from an unsafe condition the bypassed inspection would have exposed).

Furthermore, once petitioner's conduct foreseeably caused gas to escape from the unauthorized system and flood the front of the 121 basement, the ignition of that leaked gas by a spark was a foreseeable intervening event. The front of the 121 basement was a crowded space used multiple times a day to support the operations of the first-floor restaurant and as a resting area for restaurant employees. As the expert witnesses explained, the vapor cloud from the leaked gas needed only a small spark to ignite (2582, 3000, 3611). Numerous potential sources of such a spark existed in the busy area. Those potential sources ranged from someone turning on a light switch or touching a doorknob to the normal operation of basement fixtures such as the water heater, refrigerator, and walk-in freezer (2582, 3000, 3611). Thus, a fire-inducing spark generated in the course of the routine use of the busy restaurant basement was entirely foreseeable.

Petitioner's contrary arguments that the explosion was not foreseeable are meritless. First, as he did in the state courts, petitioner again disputes that the deadly gas leak came from the unauthorized, makeshift gas-delivery system at all. In his Memorandum of Law, petitioner disparages the testimony of the People's experts and trumpets the alternative scenario, endorsed by the defense expert, that the gas leak and explosion instead occurred in the first-floor restaurant and had nothing to do with the unauthorized system (*see* Pet. Mem.: 27-33). But the "battle of experts" at the state trial, *People v. Miller*, 91 N.Y.2d 372, 380 (1998), presented a credibility issue, which "is generally beyond the scope of [habeas] review," *see Schlup v. Delo*, 513 U.S. 298, 330

(1995). After all, as stated, habeas review of a sufficiency claim requires that the evidence be viewed in the light most favorable to the prosecution. *See Quartararo v. Hanslmaier*, 186 F.3d 91, 96 (2d Cir. 1999). As a corollary of that principle, a habeas court should "defer to the jury's assessment of" the credibility of the witnesses and the weight of the evidence. *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996).

Indeed, petitioner's assertion that "there remains extant the competing, if not outweighing possibility, . . . that the explosion occurred in the first-floor restaurant" (Pet. Mem.: 33), substantively implicates the weight, rather than the legal sufficiency, of the evidence. Notably, the Appellate Division rejected petitioner's claim that his conviction was against the weight of the evidence; the state appellate court specifically stated that "the jury was entitled to . . . credit the testimony of the People's expert[s] . . . that a massive volume of gas escaped from the open meter bars in the unauthorized system, ignited in the basement of 121, and followed a path up the stairs to the first-floor restaurant, then out the front of the building." *Kukic*, 196 A.D.3d at 176. Because weight-of-the-evidence review is based on New York CPL § 490.15(5) and thus entails "purely a state law claim," the Appellate Division's determination is not properly subject to federal habeas review. *Smith v. Lee*, No. 12 Cv. 6215 (PGG) (HBP), 2015 WL 5011422 at *2 (S.D.N.Y. Aug. 24, 2015), quoting *Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001); *see McKinnon v. Supt. Great Meadow Correctional Facility*, 422 Fed. Appx. 69, 75 (2d Cir. 2011).

In addition, the Appellate Division's statement regarding the conflicting expert testimony itself may be interpreted as a factual finding, entitled to deference, that the testimony of the People's expert witnesses about the source of the gas leak was credible. Under New York law, an intermediate appellate court conducting weight of the evidence review "[e]ssentially . . . sits as a thirteenth juror and decides which facts were proven at trial." *People v. Danielson*, 9 N.Y.3d 342, 348 (2007); *see Parker v. Ercole*, 666 F.3d 830, 833 (2d Cir. 2012) ("more exacting" weight of the evidence review "entails a weighing of the evidence and an assessment of the credibility of the State's witnesses"). Meanwhile, under the AEDPA, a state court's factual determination is "presumed to be correct," and can be rebutted only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Petitioner has not presented anything remotely approaching "clear and convincing evidence" that the gas leak came from a source other than the makeshift gas-delivery system.

Instead, the trial evidence convincingly showed that the unauthorized system was the source of the deadly gas leak. It was undisputed that, given how the unauthorized system had been constructed, the main shut-off valve and the ball valves on the manifold should not have been open at the same time. When the main shut-off valve was open, the ball valves on the manifold needed to be closed to prevent the gas from 119 from dangerously flowing into the front of the 121 basement. If all the valves were open, the gas from 119 inexorably would flow into the 121 basement through the uncapped meter bars. Contrary to defendants' protestations, the state court reasonably

found that jurors could reasonably draw the inference that, in the aftermath of that day's Con Ed inspection, the main shut-off valve and ball valves on the manifold all were in the open position.

More particularly, the evidence gave rise to the inference that Ioannidis had opened the valves on the manifold before the scheduled inspection, when he and petitioner argued about how best to keep the unauthorized system hidden from the inspectors. Ioannidis stressed that the valves on the manifold needed to be open if Con Ed came with new meters and conducted a pressure test on the related piping. Although petitioner advocated waiting to see if the inspectors actually came with new meters, Pacheco saw Ioannidis take a yellow handle from the ceiling and manipulate the valves on the manifold. After the explosion, Ioannidis himself wondered whether the manifold valves had been open or closed when he left the 121 basement that morning; Pacheco demurred that he could not provide a definitive answer, thus allowing that, based on what he had seen, the manifold valves well could have been open. Tellingly, all four manifold valves were open or substantially open when recovered following the explosion, and the State's expert witnesses testified that the explosion itself could not have changed the position of those valves.

Moreover, the evidence further gave rise to the ineluctable inference that petitioner reopened the main shut-off valve leading to the manifold after the Con Ed inspectors left. Petitioner insists that the failure to recover the main shut-off valve rendered a finding that he turned that valve back on "pure speculation" (Pet. Mem: 28).

But, given that reopening the main valve was the only way to have restored gas service to the 121 apartments and that petitioner was captured on surveillance footage, shortly before the explosion, entering and then exiting the 119 building that provided access to the main shut-off valve, the conclusion that petitioner reopened the main shut-off valve actually was the only reasonable one supported by the totality of the evidence.

Thus, the Appellate Division reasonably determined that the trial evidence could reasonably support the conclusion that the deadly explosion at 121 foreseeably resulted from a massive gas leak from the unauthorized system that petitioner recklessly initiated and operated, and that determination is entitled to deference in this federal habeas proceeding.

Next, the second component of petitioner's attack on the sufficiency of the evidence of foreseeability also is unavailing. Petitioner relies on several New York Court of Appeals cases—particularly *Warner-Lambert* and *Roth*—to assert that the evidence of foreseeability was insufficient because of "the absence of proof of the nature and source of ignition" (Decl.: 90). Fundamentally, however, deciding how competing state law precedent impacts a particular case presents the quintessentially state law issue of "[w]hich acts constitute the elements of a state crime." *Ponnapula*, 297 F.3d at 182. That question is beyond the scope of federal habeas review where, as here, there is no dispute that the People were appropriately subject to the burden of proving guilt beyond a reasonable doubt. *Id.* Accordingly, no legitimate basis exists for this Court to overturn

the state courts' rejection of petitioner's arguments about the applicability of state-court precedents.

In any event, petitioner is wrong in claiming that the jury's verdict here was inconsistent with New York Court of Appeals' precedents. As an initial matter, unlike this case and *Reyes*, the decisions in *Warner-Lambert* and *Roth* addressed the foreseeability requirement in the context of "deaths occurring in the course of manufacturing operations." *Warner-Lambert*, 51 N.Y.2d at 303. *Warner-Lambert* involved a fatal explosion of "ambient magnesium stearate dust arising from the procedures employed in [the] manufacturing operations" at a chewing-gum manufacturing plant. *Id.* at 298-99. *Roth* involved a fatal explosion of petroleum vapors in the facility of "a company engaged in the business of transporting petroleum products." 80 N.Y.2d at 242. That context is important. In a recent decision, the New York Court of Appeals expressly stated that the reasoning in *Warner-Lambert* and *Roth* should be understood as "address[ing] causation in the context of corporate liability" under circumstances involving "complex manufacturing process[es]," and declined to rely on those precedents in the case before it, which "involve[d] neither commercial nor manufacturing processes." *People v. DaCosta*, 6 N.Y.3d 181, 186 (2006). This case too does not involve the distinct corporate manufacturing context that was so critical to the reasoning in *Warner-Lambert* and *Roth*.

Further, petitioner wrongly suggests that, under *Warner-Lambert* and *Roth*, the manner of an explosion can never be foreseeable unless the ignition source is

-54-

specifically identified. True, the opinion in *Warner-Lambert* decried the "speculative," 51 N.Y.2d at 305, proof of the "the actual immediate, triggering cause of the explosion," *id.* at 307. But there and in *Roth* the substance that ignited was present in the workplace as a byproduct of commercial manufacturing operations that did not violate any applicable safety regulations. Here, by contrast, the gas that exploded had flooded the front of the 121 basement because of an unauthorized system created in direct contravention of applicable safety regulations. Moreover, *Roth* shows that the foreseeability of the manner of the explosion implicates concerns beyond identifying the source of the ignition. After all, in *Roth*, the Court deemed the evidence of foreseeability insufficient even though the triggering cause of the explosion was known. What was striking in *Roth* was that the ignition source—*i.e.*, "a spark from a nonexplosion proof trouble light" that was "struck by a stream of water from a high pressure washer," *id.* at 243—entailed a unique and unpredictable confluence of events. The same serendipity attended the explosion in *Warner-Lambert*. Thus, *Warner-Lambert* and *Roth* suggest that the manner of an explosion is not foreseeable when the explosion results from a chain of events that could not fairly have been anticipated.

The explosion here did not result from any such unique, serendipitous chain of events. Once the fatally flawed, unauthorized system was set up, the massive gas leak in the front of the 121 basement was foreseeable. Indeed, the gas leak resulted from the precise danger that rendered the unauthorized system inherently unsafe. Further, where the evidence showed that a variety of commonplace occurrences in the busy front of

the 121 basement could have generated the fire-inducing spark, the ignition of the leaked gas by that spark was anything but an unpredictable or aberrant outcome. Thus, the evidence fully supported the jury's determination, in keeping with the court's instructions, that it was "foreseeable that the explosion would occur in the manner that it" (*see* 5262).

Petitioner's remaining fact-based arguments also do not undermine the Appellate Division's determination that there was legally sufficient evidence of foreseeability. Petitioner's repeated refrain that Pacheco had assured him the unauthorized system was safe mischaracterizes the record and will be more fully addressed in the next subsection, which discusses the sufficiency of the evidence that petitioner acted recklessly. Meanwhile, petitioner's recurrent assertion that the unauthorized system "operated safely for over eight months" (Decl.: 90; *see* Pet. Mem.: 23) ignores at least two important points. First, the lucky fact that this system avoided disaster for several months simply does not negate the evidence showing that the system contained an inherent vulnerability. Under petitioner's argument, the defendant in *Reyes* should have been able to defeat the criminal charges by arguing that the fire-prone building did not in fact burn down for months; but nothing in that decision suggests that such a defense would have been viable. Second, petitioner's argument ignores that the explosion resulted from particular acts of concealment petitioner took that day. Although those acts had no counterpart over the prior months, they were necessitated by features of the system that were in place from the beginning, including the surreptitious nature of

this unauthorized system, the desire of petitioner and his co-defendants to disguise the system from inspectors, and the system's fundamental purpose of diverting natural gas from a neighboring building in a fundamentally irresponsible and unsafe way.

Thus, petitioner's claim that the trial evidence was legally insufficient to establish the requisite foreseeability of the explosion fails to provide any legitimate basis for habeas relief.

2. Petitioner's claim that the evidence was legally insufficient to establish his recklessness does not provide a legitimate basis for habeas relief.

The second part of petitioner's legal sufficiency claim—*i.e.*, that the evidence was legally insufficient to establish that he acted with the requisite mental culpability of recklessness—also fails to afford a legitimate basis for habeas relief. To the extent that claim is cognizable under federal habeas law, it lacks merit because the Appellate Division's determination that the evidence sufficed to prove that petitioner acted recklessly in no way constitutes an unreasonable application of federal law.

In its opinion, the Appellate Division accurately set forth the meaning of the mental state of recklessness under New York state law and then reasonably applied that law to the particular facts of this case. As the Appellate Division stated, under New York law, "[a] person acts recklessly with respect to another person's death when he or she 'is aware of and consciously disregards a substantial and unjustifiable risk that [the death] will occur,' and the risk is 'of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person

would observe in the situation.'" *Kukic*, 196 A.D.3d at 175, quoting N.Y. Penal Law §

15.05(3). Based on its review of the record, the state appellate court concluded that

legally sufficient proof of such recklessness was provided by the evidence that petitioner

"deliberately circumvented safety regulations to create and operate the unauthorized

[gas-delivery] system." *Id.*

Contrary to petitioner's suggestion, the evidence showed that petitioner well

"knew the gas delivery system was unauthorized" (Pet. Mem.: 36). As the Appellate

Division noted, the evidence showed that petitioner "had ample experience with

buildings and the relevant DOB and Con Ed regulations." *Kukic*, 196 A.D.3d at 176.

Further, petitioner knew that the DOB and Con Ed had approved a different system

for providing the 121 apartments with gas—a system that could not become operational

until Con Ed could excavate in the street and install a new three-inch gas line. In

addition, Con Ed had just shut down the entire gas supply to the 121 building in the

wake of Ioannidis's first unauthorized system for surreptitiously providing gas to the

renovated apartments, and the company had mandated that a licensed plumber repair

the problem in accordance with applicable regulations just to restore gas service to the

121 restaurant. Against that background, petitioner unmistakably knew from the start

that Con Ed would have frowned upon an unreviewed, makeshift gas-delivery system

constructed by the same unlicensed plumber who had put together the system that

generated the red flag, and he and his co-defendants purposefully hid that unauthorized

system from Con Ed and the DOB.

Moreover, the danger presented by highly flammable natural gas was widely known. By purposefully hiding the unauthorized system from regulators and "deliberately circumvent[ing] [the applicable] safety regulations," *Kukic*, 196 A.D.3d at 175, petitioner consciously—and unconscionably—disregarded that danger.

Again, petitioner's conduct was analogous to that of the building owner in *Reyes*. As stated, that owner disregarded the regulations applicable to converting a building from commercial office space into a single-room occupancy dwelling; the Court of Appeals concluded that the owner could be deemed to have recklessly created the resulting dangerous conditions that caused a deadly fire. *See Reyes*, 75 N.Y.2d at 592-94. Similarly, here, as the Appellate Division stated, when petitioner "deliberately circumvented safety regulations," *Kukic*, 196 A.D.3d at 175, for installing a new system for delivering highly flammable natural gas to the newly renovated 121 apartments, he well "understood the risk that death would occur," *id.* at 176.

Petitioner's arguments challenging the Appellate Division's holding that the evidence was legally sufficient to establish petitioner's recklessness are unavailing. As hereafter elaborated, petitioner's core assertion that he could not have acted recklessly because he reasonably relied on Pacheco's assurances that the unauthorized system was safe (*see, e.g.*, Pet. Mem: 33, 36) was properly rejected by the Appellate Division as both a mischaracterization of the evidence and legally unsound. Further, contrary to petitioner's contentions, the Appellate Division's determination was not an unreasonable application of federal law under the theory either that it "essentially carved

out a crime of strict liability" (Pet. Mem.: 35) or "violate[d] the constitutional prohibition of mandatory presumptions," as set forth in *Sandstrom v. Montana*, 442 U.S. 510 (1979) (Pet. Mem.: 36).

More particularly, as a factual matter, petitioner could not have relied on any safety assurances from Pacheco because, as the Appellate Division stated, "there was no evidence that [Pacheco] made [any such] assurances to [petitioner]." *Kukic*, 196 A.D.3d at 176. That factual determination—which can be rebutted only by "clear and convincing evidence," 28 U.S.C. § 2254(e)(1)—is not "belied by the record," as petitioner maintains (Pet. Mem.: 40), but fully accords with the evidence. Pacheco testified only that he was present at the pivotal meeting on August 6, 2014, at which petitioner vigorously championed the makeshift system. Pacheco notably did not testify that he personally made any representations at that meeting to petitioner or anyone else about the unauthorized system being discussed, let alone that he offered any assurance to petitioner that the system would be safe.

True, Pacheco testified that, when he and Ioannidis built the system two days after the August 6 meeting, he did not subjectively believe that it was dangerous (2057, 2128).[25] Pacheco also testified that, after building the system, he checked the piping for any leaks (2128-29). But Pacheco never testified that he either talked about that testing

---

[25] As the prosecutor argued on summation, that testimony likely reflected, at least in part, the difficulty of publicly acknowledging the full extent to which the system that Pacheco had helped build "led to destruction and death" (5157).

with petitioner or verbalized to petitioner or any other co-defendant any subjective belief that the system was safe. To the contrary, Pacheco testified that, even at the time, he viewed the system he and Ioannidis built as "flaw[ed]" because, if the main shut-off valve and manifold valves were open at the same time, gas would flow out the uncapped meter bars at the front of the 121 basement (1949-52).

Further, as a matter of New York law, petitioner could not reasonably have relied on any safety assurance from Pacheco. "[A] defendant may be guilty of reckless manslaughter despite his claimed belief that his acts created no danger, if such a belief was itself reckless." 6 N.Y. Prac., Criminal Law § 6:10 (4th ed.); *see People v. Reynoso*, 231 A.D.2d 454, 454 (1st Dept. 1996) (concluding that the defendant was reckless notwithstanding his claimed belief that the bullets he loaded into his gun before firing were blanks, where the asserted belief rested on untested, unverified, third-hand information). Here, as the Appellate Division stated, "even if Pacheco had made assurances to [petitioner], it would not have been reasonable for [petitioner] to rely on those assurances, given that [petitioner] knew the system, which Pacheco helped build with another unlicensed plumber, was unauthorized." *Kukic*, 196 A.D.3d at 176.

Pacheco did not work for Con Ed or the DOB, the designated repositories of regulatory authority. Thus, Pacheco was not in any position to provide an authoritative pronouncement on the unauthorized system's safety. And as the Appellate Division also stated, petitioner knew that Ioannidis, Pacheco's employer, previously had created the first unauthorized system, which had resulted in a gas leak, *id.*—an outcome at odds

with putting blind faith in Pacheco's ability, under Ioannidis's supervision, to create a system that was safe.

Nor did a finding of recklessness require a showing that petitioner knew the meter bars at the front of the 121 basement were uncapped or grasped the specific details of how gas coming in from 119 could escape through those open meter bars (*see* Pet. Mem.: 39). Simply put, when petitioner and Hrynenko purposefully decided to circumvent any review by Con Ed or the DOB, petitioner recklessly disregarded the risk that deficiencies such a review would have discovered would result in life-threatening harm, even if the mechanism was not one petitioner could specifically anticipate. *See Congregational Khal Chaisidei Skwere*, 232 A.D.2d at 920-21 (giving employee uninspected vehicle to transport staffers and campers "created a substantial and unjustifiable risk of … death," and the disregard of that risk was "a gross deviation from the standard of conduct that a reasonable person would observe in the situation").

Next, nothing about the Appellate Division's conclusion that the proof sufficiently showed that petitioner acted recklessly "essentially carves out a crime of strict liability" without any mental culpability (Pet. Mem.: 35) or "amount[s] to an unconstitutional mandatory presumption" (*id*.: 40). First, petitioner wrongly invokes *Sandstrom v. Montana*, 442 U.S. 510, where the Supreme Court held that a jury instruction that "[the] law presumes that a person intends the ordinary consequences of his voluntary acts," *id.* at 513, improperly relieved the prosecution of its burden to prove the intent element of the crime beyond a reasonable doubt, *id.* at 523-24. Here, the trial

court did not give any comparable jury instruction regarding the mens rea element of recklessness; the trial court simply and properly instructed the jurors that they needed to decide whether the required knowledge or awareness could be "inferred beyond a reasonable doubt from the proven facts," and stated that, to that end, the jurors might "consider the [particular defendant's] conduct and all of the circumstances surrounding that conduct" (5264). The trial court's instructions never even mentioned that the makeshift gas-delivery system was unauthorized, and the court instead directed the jurors to consider petitioner's conduct as a whole. Thus, petitioner's reliance on *Sandstrom* is totally inapposite.

Further, the Appellate Division's opinion fully honored the scienter requirement. The purpose of the scienter requirement is "to separate wrongful from innocent acts," and to protect against punishment for behavior that might have been "an innocent mistake to which criminal sanctions normally do not attach." *Rehaif v. United States*, 139 S. Ct. 2191, 2197 (2019). Here, petitioner did not innocently engage in conduct he was surprised to learn was "unauthorized." As stated, petitioner knew from the start that the makeshift gas-delivery system was unauthorized, yet he purposefully decided to nevertheless advocate for and assist in its creation in contravention of applicable safety regulations and procedures. Moreover, he did so, with full awareness of the dangers of natural gas, just so that Hrynenko could reap the financial benefit of immediately renting out the newly renovated 121 apartments. Petitioner's knowing and purposeful circumvention of applicable safety regulations and procedures was wrongful, not

-63-

innocent. Accordingly, the conclusion that petitioner acted recklessly with respect to the serious risk that the unauthorized system would result in great harm, including death, did not contravene Supreme Court jurisprudence regarding the need to establish scienter.

In short, the Appellate Division's conclusion that the trial evidence legally sufficed to establish that petitioner acted recklessly was not an unreasonable application of clearly established federal law.

***

For all these reasons, petitioner's claim that the trial evidence was legally insufficient to establish his guilt fails to provide any legitimate basis for habeas relief.

POINT II

PETITIONER'S CLAIM THAT THE TRIAL COURT IMPROPERLY DISCHARGED JUROR NUMBER TWO DOES NOT WARRANT HABEAS RELIEF.

Next, petitioner once again complains that the trial court should not have discharged juror number two. The trial court had dismissed that juror because she was required to be absent to take "a critically important . . . career-related examination" to become a correction officer, *Kukic*, 196 A.D.3d at 177, and her absence would have required the proceedings to be halted for a full day. Petitioner's claim fares no better than the first one as a ground for habeas relief.

As a threshold matter, the Appellate Division's holding that the trial court "providently exercised its discretion" to replace juror number two with an alternate, *id.* at 176, rests primarily on an unreviewable application of state law. To the extent the Appellate Division additionally rejected petitioner's claim that the juror substitution denied him his right to a trial "by a jury of his choosing" (Pet. Decl.: 92), its opinion was not an unreasonable application of federal law. Further, petitioner's newly minted argument that the holding violated his federal constitutional rights to due process and equal protection because it was "diametrically contrary to" the Second Department holding in *Alleyne*, 179 A.D.3d 712 (Pet. Mem.: 47; *see id.*: 46-56), is unexhausted, procedurally defaulted, and meritless.

First: Because it rests on an application of state law, a New York appellate court's holding that a juror was properly discharged under Criminal Procedure Law § 270.35 is not within the scope of federal habeas corpus review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). "Many [federal habeas] cases have applied this principle to reject requests for review of C.P.L. § 270.35 rulings." *Newmark v. Keyser*, No. 19-CV-3611 (BMC), 2020 WL 4719914 at *2 (E.D.N.Y. Aug. 13, 2020); s*ee, e.g.*, *Retallack v. Demarse*, No. 15-CV-0135 (ALC) (JCF), 2015 WL 10682147 at *2 (S.D.N.Y. June 8, 2015) ("An allegation of improper discharge of a juror is generally an issue of state law not cognizable on habeas review"). Under the New York statute, a trial court may replace a sworn juror, without a defendant's consent, before the jury begins its deliberations, if that juror "is unable to continue serving by reason of illness or other incapacity, or for any other reason is

unavailable for continued service." CPL § 270.35(1). Further, a court may "presume" a juror is unavailable for continued service and discharge the juror if, after making a "reasonably thorough inquiry concerning such . . . unavailability," the court finds that there is "no reasonable likelihood" that the juror will appear in court within two hours of the time set for the trial to resume. CPL § 270.35(2). Notably, "the juror who is or who the court reasonably believes will be more than two hours late can be conclusively presumed to be unavailable." *People v. Jeanty*, 94 N.Y.2d 507, 516 (2000).

Second: Recognizing the limits of federal habeas review, petitioner has abandoned the arguments he made before the Appellate Division that Criminal Procedure Law § 270.35 either was inapplicable here or was improperly applied, and instead makes arguments under the Sixth and Fourteenth Amendments.[26] Petitioner's attempt to transform this quintessentially state-law issue into a federal constitutional violation is unavailing.

Objectively, the Appellate Division's holding that the trial court "providently exercised its discretion in replacing . . . juror [number two] with an alternate," *Kukic*,

---

[26] Petitioner's state-law arguments would be unavailing in any event. On its face, CPL § 270.35 fully justified the discharge of juror number two: The judge made a "reasonably thorough inquiry" by himself questioning juror number two, and giving the attorneys an opportunity to question her, about her need to travel to Albany to take the "correction officer test" (2449; *see* 2451). He then gave each party ample opportunity to be heard, took time to consider their arguments, and made a careful record of the reasons he thought it appropriate to excuse the juror. As the Appellate Division correctly noted, juror number two's impending "necessary absence" of a full day significantly exceeded the "statutory two hours" that supports a conclusive presumption of unavailability for continued jury service under New York law. *Kukic*, 196 A.D.3d at 177.

196 A.D.3d at 176, could not fairly be considered an unreasonable application of federal law regarding petitioner's Sixth Amendment "right to have his guilt determined by a jury of his choosing" (Pet. Decl.: 92). "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial . . . jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Before deliberations, "[s]ubstitution of an alternate juror for reasonable cause is the prerogative of the court and does not require the consent of any party." *United States v. Millar*, 79 F.3d 338, 342 (2d Cir. 1996), quoting *United States v. Floyd*, 496 F.2d 982, 990 (2d Cir.), *cert. denied*, 419 U.S. 1069 (1974). "[N]o constitutional claim can arise from the substitution of one juror for another unless the petitioner can demonstrate that the replacement juror was biased or otherwise unfit to serve." *Holder v. Lamanna*, No. 18-CV-7431 (PKC), 2020 WL 804902 at *6 (E.D.N.Y. Feb. 18, 2020), quoting *Council v. Capra*, No. 14-CV-1849 (PKC) (MHD), 2015 WL 13746663 at *14 (S.D.N.Y. Sept. 24, 2015); *see, e.g., United States v. Hamed*, 259 Fed. Appx. 377, 378 (2d Cir. 2008) (no showing that replacement of juror with "alternate … against whom [the defendant] declined to exercise a peremptory challenge affected any of [defendant's] substantial rights"); *United States v. Evans*, 352 F.3d 65, 70 (2d Cir. 2003) (substitution of alternate juror did not result in prejudice or "a drastic shift in the jury's composition"); *Edmonds v. McGinnis*, 11 F. Supp.2d 427, 433 (S.D.N.Y. 1998) (trial court "was well within its discretion when it discharged [a juror] for reasonable cause and substituted an alternate juror in her place").

Here, the imperative to avoid unnecessary delay and keep the trial on schedule provided ample "reasonable cause" to discharge juror number two and replace her with an alternate juror. The trial was a very lengthy one, which already had gone on for about two months. Part of the screening for jurors had involved communicating a specific schedule, which included both a week-long break in the trial from the afternoon of October 30th through November 7th for the judge to attend a family celebration and an expectation that the trial would conclude by mid-November and by Thanksgiving "at the latest" (Exh. E p. 2). The critical, career-related examination juror number two needed to take was scheduled for October 29th, the day before the scheduled break; and, as the Appellate Division noted, having already postponed the examination once on account of the trial, the juror "could not reschedule" the examination again. *Kukic*, 196 A.D.3d at 177.

Faced with those circumstances, the trial judge appropriately recognized that "[t]hings do often take longer than expected" (4374), as had already happened on several occasions during the trial. He similarly appropriately was concerned that, at that late stage of the trial, there was "less and less room to maneuver" (*id.*) and still end the trial before Thanksgiving, as all the jurors had been promised. Indeed, although the court and parties originally had contemplated that all of the evidence would be completed before the scheduled break (*see* 109), as the break approached, the prosecution had not yet completed presenting its evidence; the revised hope at that point was that the prosecution could complete its direct case before the break and the

-68-

defense could commence its case after the break (*see* 4374-75). Accordingly, the trial judge reasonably concluded that the interest in efficiently completing the long trial in a manner most compatible with the interests of all the jurors made it inadvisable to skip an entire day of testimony when he instead could replace juror number two with an alternate juror and continue to take testimony. *See McGinnis*, 11 F. Supp.2d at 433 (trial judge properly exercised his discretion to dismiss juror who had an impending real estate closing that would have required the proceedings to be adjourned for an "entire day").[27]

Petitioner fails even to suggest that the alternate who replaced juror number two "was biased or otherwise unfit to serve." *Lamanna*, 2020 WL 804902 at *6. Additionally, "[t]he alternates were chosen along with the regular jurors and by the same procedures." *United States v. Hillard*, 701 F.2d 1052, 1056-57 (2d Cir. 1983). Simply put, where petitioner had a voice in selecting all the jurors, including the alternate who replaced juror number two, the latter was not properly viewed from a constitutional standpoint as any more "favored" (Pet. Dec.: 64) than the alternate who replaced her. *See Jeanty*, 94 N.Y.2d at 517 ("replacement with an alternate juror is not, as a rule, a violation of the right to trial by jury"; "before jury deliberations, there is no material distinction

---

[27] As it turned out, the jury got the case on November 13th and reached a verdict on November 15th. But, given that, at the time, the length of the already-scheduled testimony was unknown and the judge also had to account for the possibility that all three defendants might testify as well as that the People would present a rebuttal case, it was entirely reasonable for the judge to be concerned that they would be "pressing up" against the week of Thanksgiving (4201).

between regular and alternate jurors") (citations omitted). Thus, the substitution of the alternate juror for juror number two based on "reasonable cause" to believe the substitution would promote the efficient resolution of the case did not violate petitioner's constitutional right to a trial by an impartial jury of his choosing.

Third: Petitioner's novel invocation of his constitutional rights to due process and equal protection is similarly unavailing. Petitioner complains that the New York Court of Appeals "failed in its assigned duty to cure" what he characterizes as "the conflict between" the holdings in this case and the Second Department opinion in *Alleyne* (Pet. Mem.: 55). He maintains that, based on *Alleyne*, the Second Department would have decided the juror discharge issue in his favor, and that his constitutional rights to due process and equal protection were violated "where, had he been tried across the East River in Kings County, he would have been granted a new trial on appeal" (*id.*: 51). This claim is unexhausted, procedurally defaulted, and utterly without merit.

Generally, habeas review requires that the petitioner "first presented [the relevant] claim to the state court in accordance with state procedures." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1727, 1732 (2022). More particularly, a petitioner may not properly obtain habeas review of a federal claim unless he has "exhausted" that claim by fairly presenting its legal and factual bases to the state courts, including a state high court "with powers of discretionary review[.]" *See* 28 U.S.C. § 2254(b)(1)(A); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Jones v. Murphy*, 694 F.3d 225, 246-47 (2d Cir. 2012). The only

exception is that the habeas court may deny an unexhausted claim that is meritless. *See* 28 U.S.C. § 2254(b)(2). The "corollary" doctrine of procedural default, *Ramirez*, 142 S. Ct. at 1732, precludes habeas review of an unexhausted federal claim that a petitioner no longer can present to the state courts under state procedural rules. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). A habeas court may not excuse a procedural default unless the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Ramirez*, 142 S. Ct. at 1733, quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Here, although petitioner relied on *Alleyne*, 179 A.D.3d 712, when he presented his arguments before the First Department, and then asked the Court of Appeals to allow a further appeal to resolve the assertedly "conflicting" holdings, he never claimed before either state appellate court that the asserted conflict implicated the federal constitutional rights to due process or equal protection. Petitioner seeks to evade the consequences of that failure by quoting language from other opinions that "once a federal claim is properly presented, a party can make any argument in support of that claim" (Pet. Mem.: 46, quoting *Hemphill v. New York*, 142 S. Ct. 681, 689 [2022] [citation omitted]). But that language embraced differing legal theories offered in support of a claimed violation of a single constitutional right. Here, by contrast, petitioner invokes constitutional rights entirely distinct and separate from the constitutional right to a jury trial that he previously invoked. Accordingly, petitioner has failed to exhaust his current

claim that the discharge of juror number two violated his constitutional rights to due process and equal protection.

Moreover, it is too late for petitioner now to present such a constitutional claim to the state courts via some sort of post-judgment motion, because petitioner could have raised the claim in his direct state appeal but unjustifiably failed to do so. *See* CPL § 440.10 (2)(c). Therefore, the claim further is barred by procedural default. *See Jones v. Murphy*, 694 F.3d 225, 248 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1247 (2013). Petitioner has not offered any explanation that could demonstrate cause to excuse that procedural default. Nor can petitioner establish any prejudice that would absolve that default: As previously discussed, the discharge of juror number two did not violate petitioner's constitutional right to a jury trial; and as elaborated below, petitioner's novel claim that the outcome violated his constitutional rights to due process and equal protection utterly lacks merit.

Contrary to petitioner's formulation, the constitutional rights to due process and equal protection do not give a federal habeas court the power to police the decisions of state appellate courts for "uniformity" (Pet. Mem.: 54). "[T]he right to appeal is not [even] essential to due process." *State of Ohio ex rel. Bryant v. Akron Metropolitan Dist. for Summit Co.*, 281 U.S. 74, 80 (1930). In terms of equal protection, "[i]t is . . . well established that there is no requirement . . . that the state shall adopt a unifying method of appeals which will insure to all litigants within the state the same decisions on particular questions which may arise." *Id.* at 81. The equal protection clause "does not

assure uniformity of judicial decisions . . . [or] immunity from judicial error." *Beck v. Washington*, 369 U.S. 541, 554-55 (1962) (quotation marks and citations omitted). Relatedly, a showing of disparate impact is not enough to make out an equal protection violation; the proponent of the claim also "has the burden of proving the existence of purposeful discrimination." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (citation omitted).[28] Thus, petitioner's argument that this habeas court should step in and perform the role he maintains the New York Court of Appeals improperly shirked of reconciling conflicting opinions from the different Departments to "declar[e] an authoritative body of decisional law" for the State (Pet. Mem.: 54) would entail an unprecedented, unjustified expansion of the due process and equal protection guarantees.

In any event, petitioner is wrong to suggest that there is a conflict between this case and *Alleyne*. The crux of petitioner's error is his mistaken assertion that the cases "involve[ed] identical alleged errors" (*id.*: 53). In reality, this case and *Alleyne* entailed significantly different factual contexts. Because the differing outcomes reasonably may

---

[28] Petitioner's contention that the opinion in *State of Missouri v. Lewis*, 101 U.S. 22 (1879), requires "a rational basis" for "distinctive" appellate outcomes within a single state (Pet. Mem.: 52) flies in the face of the plain case law that disparate impact is insufficient to establish an equal protection violation. Contrary to petitioner's claim, where the law being applied is facially neutral, "its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present . . . an element of intentional or purposeful discrimination." *Snowden v. Hughes*, 321 U.S. 1, 8 (1944).

be attributed to those different factual contexts, the respective holdings are not at all "irreconcilable" (*id.*: 50).

The Second Department expressly linked its reasoning in *Alleyne* to "the facts of this case." 179 A.D.3d at 713. In *Alleyne*, the trial court excused juror number ten and replaced her with an alternate after both sides had rested and before summations. The substitution occurred after juror number ten told the court that she would need to leave early the following afternoon—a Friday—to travel to Maryland for an evening work obligation. *Id.* at 712. Even though the juror still could have been present for part of the Friday proceedings, the judge discharged her; the jury then returned its guilty verdict on that Friday. *Id.*[29] The Second Department reversed the conviction, reasoning that "the record d[id] not demonstrate" that the juror was "unavailable as that term is used in CPL 270.35," and that "minor scheduling difficulties, including any *brief* delay which may have ensued had the [j]uror['s] schedule been accommodated, [we]re not meaningful counterweights to the defendant's constitutional right to trial by a jury in whose selection he ha[d] participated." *Alleyne*, 179 A.D.3d at 713 (emphasis added).

Various notable differences exist between the facts in *Alleyne* and the facts in this case. First, unlike juror number two, the *Alleyne* juror did not need to be gone for an

---

[29] According to the respondent's brief in *Alleyne*, the trial judge reasoned that it would not be efficient for the jury to deliberate only two to three hours on Friday, as he expected would be the case if, as he anticipated, he finished his jury charge at 11:15 a.m. on Friday and then allowed the juror to leave early (*Alleyne* Respondent's Brief at 11).

entire day; her work obligation could have been accommodated by ending the Friday proceedings several hours early. Second, nothing in the *Alleyne* opinion suggests that the trial there was a lengthy one that entailed long-standing scheduling concerns, as did the trial here. Third, in *Alleyne*, the trial testimony already had been completed; all that remained when the juror discharge issue was raised were summations, the final instructions, and the jury's deliberations. Here, by contrast, additional testimony still needed to be presented within the constraints of the long-standing scheduling concerns.

Further, the *Alleyne* juror was concerned about a work obligation for a job she already had; by contrast, juror number two was concerned about taking an examination needed for her to pursue her desired career. Given that difference, the Second Department reasonably characterized the *Alleyne* juror's "employment-related reason" (Pet. Mem.: 49) for needing to be absent as a matter of "her own convenience or potential financial hardship," 179 A.D.3d at 313, whereas the First Department stated that "[m]issing the [scheduled] examination would have caused [juror number two] 'compelling hardship, rather than mere inconvenience.'" *Kukic*, 196 A.D.3d at 177 (citation omitted).

From the standpoint of the constitutional right to a jury trial, those different factual contexts reasonably support different conclusions as to the existence of

"reasonable cause" to substitute the alternate juror.[30] Contrary to petitioner's argument, therefore, those different determinations do not suggest different views of the contours of the constitutional right to a jury trial, as petitioner imagines in claiming a violation of his constitutional rights to due process and equal protection.

For all these reasons, petitioner's claim that the state trial court improperly discharged juror number two fails to warrant habeas relief.

## CONCLUSION

For the foregoing reasons, the writ of habeas corpus should be denied, and the petition should be dismissed, without an evidentiary hearing, pursuant to Rule 8(b), Rules Governing 28 U.S.C. § 2254 cases.

---

[30] Interestingly, from the standpoint of state law, the opinion in *Alleyne* never even references the "two-hour rule" set forth in CPL § 270.35(2).

Respectfully submitted,


ALVIN L. BRAGG, JR.
District Attorney
New York County


BY:   /s/  *Sylvia Wertheimer*
     SYLVIA WERTHEIMER
     Attorney of Record
     wertheimers@dany.nyc.gov


STEVEN C. WU (SW1735)
SYLVIA WERTHEIMER (SW6225)
  Assistant District Attorneys
    Of Counsel

June 30, 2022