UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 02/28/2023

Dilber Kukic,

                  Petitioner,

     -against-

Phil Melecio,

                  Respondent.

1:22-CV-02684 (CM) (SDA)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9 25 2023

Maria Hrynenko,

                  Petitioner,

     -against-

Emily Williams,

                  Respondent.

1:22-CV-09075 (CM) (SDA)

**REPORT AND RECOMMENDATION**

MEMO ENDORSED

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

**TO THE HONORABLE COLLEEN MCMAHON, UNITED STATES DISTRICT JUDGE:**

### INTRODUCTION

This Report and Recommendation is issued with respect to two consolidated habeas

cases, *i.e.*, *Kukic v. Melecio*, No. 22-CV-02684 (CM) (SDA), and *Hrynenko v. Williams*, No. 22-CV-

09075 (CM) (SDA), which arise out of the same jury trial conducted in New York state court.

In 22-CV-02684, Petitioner Dilber Kukic ("Kukic") filed a Petition on April 4, 2022[1] seeking

a writ of habeas corpus as authorized by the Antiterrorism and Effective Death Penalty Act of

---

[1] Kukic's Petition initially was filed on April 1, 2022, but was refiled on April 4 due to a filing error.

9/25/2023 - Having renewed the Objections to the learned Mag+ the Judge's
Report I conclude they are entirely lacking in merit and I reject them.
The Report — which I adopt as the opinion of the court — is amply supported
by the law and the record. Accordingly, the petits in these are DENIED, and these case
are DISMISSED. I note that the challenge to remove the judge is ABANDONED.
(rev)

The petition presents no issue of constitutional significance so no certificate of appealability shall issue. An appeal from this order would not be taken in good faith.

Colleen McMahon

1996 ("AEDPA"), 28 U.S.C. § 2254.[2] (Kukic Pet., 22-CV-02684 ECF No. 3.) In 22-CV-09075, Petitioner Maria Hrynenko ("Hrynenko") filed a Petition on November 1, 2022[3] seeking a writ of habeas corpus as authorized by AEDPA.[4] (Hrynenko Pet., 22-CV-09075 ECF No. 3.)

Pursuant to a January 17, 2020 judgment of the New York State Supreme Court, New York, County, Kukic and Hrynenko each was convicted, after a jury trial, of two counts of manslaughter in the second degree under New York Penal Law ("NYPL") §125.15(1), nine counts of assault in the second degree under NYPL §120.05(4), four counts of assault in the third degree under NYPL §120.00(2) and one count of reckless endangerment in the second degree under NYPL § 120.20. (Melecio Answer, 22-CV-02684 ECF No. 11, ¶ 2; Williams Answer, 22-CV-09075 ECF No. 13, ¶ 2.) Each of Kukic and Hrynenko was sentenced to an aggregate term of 4 to 12 years. (Id.)

In their Petitions, Kukic and Hrynenko challenge their convictions on two grounds: (1) they were deprived of due process based upon legal insufficiency of the evidence at trial, and (2) the trial court violated their Sixth Amendment rights by discharging a juror. (See Baker Decl. ¶¶ 170-75; Hrynenko Pet. at 5-7.) For the reasons set forth below, I respectfully recommend that Kukic's and Hrynenko's Petitions be DENIED in their entirety.

---

[2] Kukic currently is incarcerated at Wallkill Correctional Facility, where Respondent Phil Melecio is Superintendent. (Baker Decl., 22-CV-02684 ECF No. 3-1, ¶ 5; Melecio Resp. Mem., 22-CV-02684 ECF No. 13, at 1-2.)

[3] Hrynenko's Petition initially was filed on October 28, 2022, but was refiled on November 1 due to a filing error.

[4] Hrynenko currently is incarcerated at Taconic Correctional Facility, where Respondent Emily Williams is Superintendent. (Hrynenko Pet. at 1.)

## BACKGROUND[5]

### I.   Overview

On March 26, 2015, two people were killed and 13 others were injured in an explosion

that followed the rigging of a gas line from one building to another, without Consolidated Edison

("Con Ed") approval,[6] by Hrynenko, who was the landlord, and her general contractor, Kukic. *See*

*People v. Kukic*, 196 A.D.3d 169, 171 (1st Dep't 2021). The habeas petitions at issue in this case

follow the criminal convictions in New York state court of Hrynenko and Kukic arising from the

foregoing.

---

[5] Transcripts of the proceedings in state court are filed at 22-CV-02684 ECF No. 12: 1-5344 (trial transcript) and 5345-97 (sentencing transcript). Citations to the transcripts are made using the prefix "Tr." followed by the relevant page number(s) and, where applicable, the name of the testifying witness in parentheses.

[6] The distribution of natural gas to buildings through pipelines is heavily regulated by multiple government agencies due to its highly flammable and dangerous nature. (Tr. 3552-53 (Thornton Tomasetti Forensic Mech. Eng'r Michael Dowdall ("Dowdall")).) In Manhattan, natural gas is provided by Con Ed, which imposes many of its own rules and regulations. (Tr. 529-30 (Con Ed Manager Velez ("Velez")).) Due to the danger posed by natural gas, Con Ed adds the odorant mercaptan to the naturally odorless, colorless and tasteless natural gas so that gas leaks can be detected. (Tr. 672-73, 726 (Con Ed Employee John DeLuca ("DeLuca")).) Natural gas is lighter than air and rises, and, when it mixes with air at certain concentrations, it can ignite and cause an explosion. (Tr. 673, 776 (DeLuca).)

To initiate the process of installing gas services, a customer must submit a detailed work request to Con Ed, which reviews the submission and generates a "service determination," which details the specifics for the project, including the internal piping and related work for which the customer is responsible. (Tr. 531-37 (Velez); Tr. 673-76, 681-82 (DeLuca).) In order to install internal gas piping, which is regulated by the Fuel Gas Code, a building owner must obtain a permit from the New York City Department of Buildings ("DOB"). (Tr. 1346, 1348-50, 1354 (Deputy Borough Comm'r Raine ("Raine")).) One of the DOB's requirements is that a licensed master plumber must perform all plumbing work. (Tr. 537-38 (Velez).) The process further requires that the contractor both follow the plans submitted to and approved by the DOB and follow Con Ed's specifications. (Tr. 1363-64 (Raine); Tr. 538-39 (Velez).) Moreover, a contractor is not allowed to tap into an existing gas meter or to build a gas system without Con Ed's involvement and approval. (Tr. 538-39 (Velez).)

3

## II.   Facts Giving Rise To Convictions Of Kukic And Hrynenko

### A.   The Subject Buildings, Renovations And Gas Supply

Hrynenko owned and managed two adjacent five-floor buildings, 121 Second Avenue ("121") and 119 Second Avenue ("119").[7] (Tr. 3961-63, 3995-96 (Detective Ducceshi ("Det. Ducceshi")); Tr. 4400 (Taylor).) The first floor of 121 was rented to Sushi Park restaurant, and each of the upper floors contained apartments. (Tr. 124-25 (Eng'g Technician Gonzales ("Gonzales")); Tr. 4351 (Principal Fin. Investigator Serrano ("Serrano")).)

In 2013, Hrynenko began to gut-renovate the apartments at 121, including carpentry, plumbing and air-conditioning. (Tr. 1358-60 (Raine).) She hired Kukic, an experienced general contractor licensed by the DOB. (Tr. 1299-1300 (DOB Senior Licensing Att'y Lee ("Lee")); Tr. 4401 (Taylor); Tr. 4337-38 (Serrano).)

On May 29, 2013, Hrynenko applied to the DOB for permission to renovate the apartments at 121, including installing four new gas meters in the basement to accommodate new appliances for the apartments. (Tr. 1358-72, 1429, 1439-41 (Raine).) At the time, there were two gas meters at 121, the left gas meter, which provided gas to Sushi Park, and the right gas meter, which provided gas to the apartments. (Tr. 565 (Velez).) The DOB approved the plan on August 14, 2013, and subsequently issued work permits to Kukic, as the general contractor, and Andrew Trombettas ("Trombettas"), as the licensed plumber. (Tr. 1375-77 (Raine).)

---

[7] As a building owner, Hrynenko had past experience responding to notices of violation issued by the DOB and the New York City Department of Housing, Preservation and Development ("HPD"), including paying fines and showing that the offending conditions had been corrected by submitting certificates of compliance. (Tr. 1398-1418 (Raine); Tr. 4285-93 (HPD Citywide Chief Inspector Frederick Thomasel).) Over a period of years, Hrynenko sent numerous text messages to workers she hired, and many of those texts referred to the need to file documents with the DOB and to comply with DOB and HPD regulations. (Tr. 4406-25, 4432-39 (Assistant Inspector General Taylor ("Taylor").)

4

On March 13, 2014, Hrynenko applied to Con Ed for approval of her plan to replace the existing right gas meter for the four apartments with four new gas meters (Tr. 546-50, 565 (Velez).) Con Ed determined that the existing right gas line at 121 was inadequate and issued a "gas service layout," explaining that the existing 1¼-inch gas line into the building would need to be replaced with a 3-inch gas line because the smaller gas line was inadequate to carry the additional load needed to power the new appliances. (*Id.* 552-57.) For Con Ed to provide a larger gas line, the customer was required to comply with certain requirements, including installing a 5-inch diameter sleeve. (*Id.* 556-57.) In its gas service layout, Con Ed noted that unmetered conditions were not permitted and would be terminated. (*Id.* 557.)

On April 8, 2014, a representative from Con Ed met with Kukic's plumbing subcontractor, codefendant Athanasios "Jerry" Ioannidis ("Ioannidis"),[8] who was not a licensed plumber, at the building to determine where the new service line should be placed. (Tr. 559-61 (Velez); Tr. 1306 (Lee).) Thereafter, the Con Ed representative generated a field sketch for the installation of the larger gas line. (Tr. 560 (Velez).) On May 16, 2014, following a series of exchanges between Con Ed and Ioannidis, Con Ed formally authorized construction of the new, larger gas service line. (*Id.* 567-74.) Con Ed noted that the new gas service was anticipated to begin within six months, *i.e.*, by November 17, 2014. (*Id.* 574.)

On July 11, 2014, Hrynenko texted Kukic that she had rented apartments 3, 4 and 5 in the 121 building for occupancy effective August 1, 2014. (Tr. 4496 (Taylor).) She did so despite knowing that Con Ed had not yet been able to install the new, larger gas line for the authorized,

---

[8] Ioannidis was a part-owner in Beta Plumbing with Trombettas. (*See* Tr. 1889 (Pacheco).) However, only Trombettas was a licensed master plumber. (*Id.*)

new gas-distribution system. (*Id*. 4496-97.) Hrynenko informed Kukic that she spoke to "the restaurant owner," and that it was "no problem" for Kukic to "hook up gas to his line." (*Id*.)

On August 6, 2014, a Con Ed meter reader smelled a strong gas odor in the basement of the restaurant and, after investigating, Con Ed employees Antonio Diecidue ("Diecidue") and Frank McBrien ("McBrien") discovered the left gas meter had four flex hoses being used to transfer the gas from the restaurant to the upper-floor apartments and that these flex hoses were leaking gas. (Tr. 829-30, 842-43 (Con Ed Meter Reader Weisenberger); Tr. 578-81 (Velez); Tr. 680-83 (DeLuca); Tr. 1738-44 (Diecidue); Tr. 2797-2802 (McBrien).)

Con Ed issued a "red tag," which notifies the building and documents for Con Ed a violation, for a leak in "illegal piping;" shut down the gas service to the left gas meter, which was the only existing gas meter at 121 given the pending installation of the four new gas meters; and locked the gas supply. (Tr. 578-80, 586-88 (Velez); Tr. 1746-53, 1757 (Diecidue); Tr. 2802 (McBrien).) The gas service was shut off for all of 121, including Sushi Park and the apartments above. (*Id*.)

On August 7, 2014, a "managing agent" of 121 called Con Ed and was informed by Con Ed that the plumber's actions were illegal and that the plumber needed to submit a new work order for the red tag. (Tr. 590-91 (Velez).) On August 8, 2014, Con Ed sent a letter to MAH Realty, LLC ("MAH Realty"),[9] indicating that to correct the red tag and restore gas service, a "licensed plumbing contractor" must repair or replace all defective equipment in accordance with Con Ed specifications and requirements. (*Id*. 593-94.)

---

[9] MAH Realty was the company through which Hrynenko managed 121. (Tr. 546, 634 (Velez); Tr. 1360 (Raine).)

6

Around the time that the red tag was issued, Hrynenko and Kukic met with Ioannidis and Eric Pacheco ("Pacheco"),[10] another unlicensed plumber, to help address the red tag.[11] (Tr. 1896 (Pacheco).) Upon inspection of the red tag, Pacheco found a crack in the restaurant's meter bar and proceeded to remove and replace the meter bar. (*See id*. 1898.) At some point around this same time, Pacheco met Hrynenko, Kukic and Ioannidis in the basement of 119. (*Id*. 1903.) While in the basement, Hrynenko and Kukic walked to the back corner of the basement, where the gas meter that fed the store in 119 was located. (*Id*. 1903-04.) Kukic explained to Hrynenko that the gas meter could also feed the four apartments in 121 because it was large enough. (*Id*.) They discussed a plan to feed the gas with piping through the foundation wall, connecting the two buildings through a "back room" behind the partition wall in the 121 basement, which could be accessed through a door in the 119 basement. (*Id*. 1878, 1907 (Pacheco); Tr. 127 (Gonzales).) Kukic told Hrynenko that this plan "could be done" and that it was "the only option." (Tr. 1907-08 (Pacheco).) After Hrynenko left, Kukic told Ioannidis and Pacheco that Hrynenko agreed to the plan and that they could "do the job" the following day. (*Id*. 1909.) Pacheco testified that the priority was to get the gas back on at 121 because Ioannidis told him that, if the gas stayed off for more than one or two months, Hrynenko would start penalizing Kukic $5,000.00 per month. (*Id*. 1911.)

---

[10] Pacheco testified at trial pursuant to a cooperation agreement. (Tr. 1876-78 (Pacheco).) Pacheco worked with Ioannidis and was trained in plumbing by him; however, neither Ioannidis nor Pacheco was a licensed plumber. (*Id*. 1883-89; Tr. 1306 (Lee).)

[11] Pacheco was unable to recall the date that he met Ioannidis at 121 with Hrynenko and Kukic; however, cell site records reveal that the devices of Hrynenko, Kukic and Ioannidis were in the vicinity of 121 on August 6, 2014, and the devices of Kukic and Ioannidis were in the vicinity of 121 on August 7 and 8, 2014. (Tr. 2527-28 (Data Engineer Weber).)

Thereafter, Ioannidis, Pacheco and another worker built the system that transferred gas from the meter in 119 to the apartments in 121.[12] (Tr. 1920-27, 1951, 2053-55 (Pacheco).) Certain meter bars in the basement of 121 were left uncapped by Pacheco because the pipes to which they were attached were supposed to connect to the four new meters to be installed by Con Ed.[13] (*Id.* 1947.) Ioannidis inspected the system upon completion and told Pacheco to remove the handles, which were used as indicators of whether particular valves were open and were used to turn the gas on or off. (*Id.* 1940-44.) The workers then tested the new system by turning on the gas and checking for leaks in the new piping, but they did not check for leaks in any existing equipment. (*Id.* 1948-49.) Hrynenko's son, Michael Hrynenko, and another individual checked at least one apartment in 121 to see if gas was flowing to the apartment. (Tr. 1704-05 (121 Tenant Steven Speacht ("Speacht").)

Although Pacheco testified that he did not think the new system was dangerous, he admitted that it was flawed because, if the shut-off valve was turned on and the gas from 119 was turned on, gas would flow through the uncapped meter bars into the basement of 121. (Tr. 1951-52, 2128 (Pacheco).) A prosecution expert, master plumber Keith Cappuccio ("Cappuccio"), testified that this system was inherently unsafe due to it having an open end exposed to live pressurized natural gas. (Tr. 3387-88 (Cappuccio).) Cappuccio further testified that removing the

---

[12] Pacheco was unable to recall the date that he began work to transfer gas from 119 to 121 but stated that it was "coming close to winter." (*See* Tr. 1916 (Pacheco).) However, on the morning of August 8, 2014, Ioannidis texted Kukic, "I am at the job site" (*See* Tr. 4508 (Taylor)), and, later that day, a tenant texted Hrynenko that she had hot water after not having hot water that morning. (*See id.* 4508-10 (Taylor).)

[13] Uncapped meter bars are an immediate safety concern because there is no control of the gas flow, and the gas will leak. (Tr. 697-98, 775 (Deluca); Tr. 2855-56 (Truelson); Tr. 3768 (Davis).)

handles from the valves was contrary to industry standards and made it difficult to determine whether the valves are open or closed. (*Id.* 3378.)

After the new system transferring gas from 119 to 121 was completed, Hrynenko, Ioannidis and the owner of Sushi Park met with the manager of Sushi Park at the time, Hyun Jun Kim ("Kim"), in the basement of 121. (Tr. 2948 (Kim).) Ioannidis gave instructions to the owner of Sushi Park, who then relayed those instructions to Kim, on how to operate the valve in the basement of 119 to transfer gas to the restaurant in 121. (*Id.* 2948-49.) Hrynenko and Ioannidis told the owner of Sushi Park, who then told Kim, not to repeat the instructions to anyone else. (*Id.* 2950.) Kim then showed Sushi Park employee, Danny Kang ("Kang"),[14] how to turn the gas from 119 on and off. (*Id.* 2951; Tr. 2380-81 (Kang).) Early in the day, Sushi Park would use butane gas burners and, later in the day during the evening rush, Kim or Kang would turn on the gas from 119 to fuel Sushi Park in 121. (Tr. 2381 (Kang).)

On August 11, 2014, a self-certification affidavit[15] was submitted to Con Ed in the name of Trombettas to unlock the gas supply in 121 by certifying that the cracked gas meter piping installed at 121 had been repaired and successfully passed a leakage test. (Tr. 598-99 (Velez).) On August 15, 2014, Con Ed restored gas service to the left gas meter to the restaurant in 121. (*Id.* 603-06.) On August 18, 2014, Hrynenko texted Kukic to think about using Sushi Park's licensed plumber in the future because "he is cheaper [and] does the right job." (Tr. 4511 (Taylor).)

---

[14] Kang was initially an employee of Sushi Park, but after Kim resigned and relocated to Austin, Texas in January 2015, Kang became the manager. (Tr. 2351 (Kang); Tr. 2922-23 (Kim).)

[15] Depending on the scope of work and the requirement with the DOB, a licensed plumber is allowed to self-certify on certain jobs. (Tr. 611 (Velez).)

9

**B.    Leadup To The Explosion**

On March 19, 2015, a Con Ed representative spoke on the phone with Ioannidis, who was

pretending to be "Andrew" (*i.e.,* Trombettas, who was a licensed plumber), and scheduled

another site visit intended to be with Trombettas for March 26, 2015, at 2:00 p.m. (Tr. 638-39

(Velez); Tr. 1959-60, 2229-30 (Pacheco).) The purpose of the visit was to do a final inspection

prior to activating the new gas service. (Tr. 641 (Velez).) Four days before the scheduled Con Ed

site visit on March 26, 2015, Hrynenko texted tenants of the 121 apartments that new gas meters

would be installed on March 26 and that this would require that their gas service be shut off for

about two hours. (Tr. 1712-13 (Speacht); Tr. 1816, 1835 (121 Tenant Karen Reily-Yancey ("Reily-

Yancey").) Hrynenko asked for and received permission to enter the tenants' apartments. (Tr.

1713-14 (Speacht); Tr. 1816 (Reily-Yancey).)

On March 26, 2015, Ioannidis and Pacheco arrived at 121 prior to the scheduled 2:00 p.m.

Con Ed appointment. (Tr. 1961 (Pacheco).) Kukic met Ioannidis and Pacheco and unlocked a door

at the 7th Street entrance leading to the basement of 121, where the three men went to the back

room to "dismantl[e] the meters." (*Id.* at 1962-64; People's Ex. 4[16] at 13:00-13:33 & 21:11-21:39

(12:51:40-12:52:08), individuals identified at Tr. 1992-93 (Pacheco).) Ioannidis started working

on the pipes in the ceiling using a valve handle with the intention of disconnecting the system,

but Kukic did not want it disconnected. (*Id.* 1965-69.) Ioannidis and Kukic argued over how to

handle the situation because Ioannidis believed Con Ed was installing the meters that day and

---

[16] People's Ex. 4 is a compilation of video footage recorded on March 26, 2015 that was admitted in
evidence (Tr. 1792) and shown to the jury at trial. Citations to the video are made using the elapsed time
in the video compilation followed in parentheses by the March 26, 2015 time-stamp (reflecting the time
of day).

Kukic believed the meters were not arriving that day. (*Id.*) Ultimately, Ioannidis and Kukic decided to leave the valves in their existing position of closed, and Kukic shut off the gas supply from 119 to 121. (Tr. 1970-71.) Reily-Yancey testified that at approximately 1:30 p.m., a tall, burly man with longer curly dirty blond hair and a European accent came to her 121 apartment, "fiddled with the gas stove and ran water," and told her that "if anyone asks, say [she] never had gas here before."[17] (Tr. 1818-19 (Reily-Yancey).) There is video evidence that around 1:30 p.m., after Kukic turned off the gas system, he met with Hrynenko in Hrynenko's office. (People's Ex. 4 at 36:28-51:10 (13:27:58-13:54:38), Kukic identified at Tr. 1996 (Pacheco).)

Con Ed inspectors DeLuca and Sandro Giraldo ("Giraldo"), met Kukic, Ioannidis and Pacheco at approximately 1:45 p.m. and went to the 121 basement where the new meters were supposed to be installed.[18] (Tr. 677 (DeLuca).) The Con Ed inspectors found several deficiencies in the piping for the authorized system, which resulted in a failed inspection. (*Id.* 702.) At this point, the Con Ed inspectors had no reason to believe that 121 had gas service, given that they had not authorized them to have it. (Tr. 815, 820 (Giraldo); Tr. 697, 700 (DeLuca).) DeLuca testified that the plumbing work was "very sloppy, very poor" and that the plumber did not follow the required specifications. (Tr. 702 (DeLuca).) When DeLuca verbally informed Ioannidis and Kukic that they failed the inspection, both Ioannidis and Kukic were disappointed, but Ioannidis was aggravated while Kukic "wasn't too boisterous about it." (Tr. 708 (DeLuca); Tr. 791 (Giraldo).) The Con Ed inspectors next followed Ioannidis and Kukic upstairs to the apartments to visually

---

[17] Reily-Yancey was unable to affirmatively identify Kukic as the man with whom she spoke (Tr. 1860 (Reily-Yancey); however, Kukic matched her description because he had an accent and was at least six-feet tall with a bulky or muscular build. (*See* Tr. 686-87 (DeLuca); Tr. 2374 (Kang); Tr. 2253 (Pacheco).)

[18] The Con Ed inspectors did not go into the back room of 121 during their visit. (*See* Tr. 692. (DeLuca).)

11

inspect the valves and connections behind appliances. (Tr. 709-12 (DeLuca); Tr. 791-93 (Giraldo).) At no point did either inspector smell gas. (Tr. 713 (DeLuca); Tr. 795 (Giraldo).)

At 2:36 p.m., Pacheco asked Kukic if he wanted Pacheco to go downstairs and turn everything on, to which Kukic responded, "I got it." (Tr. 2000 (Pacheco).) After the inspection, around 2:39 p.m., Kukic again met with Hrynenko. (People's Ex. 4 at 1:42-1:54 & 1:55-1:56 (14:39:00-14:53:20), Kukic identified at Tr. 2001-02 (Pacheco).) Then, at 2:53 p.m., Kukic entered the basement of 119 through the 7th Street entrance and, at 2:56 p.m., he left the building. (People's Ex. 4 at 1:58, 2:08-2:09 & 2:10 (14:53:20-14:54:05, 14:56:07-14:56:35), Kukic identified at Tr. 2002-03 (Pacheco).) Approximately 25 to 30 minutes after Con Ed visited the apartments, tenant Reily-Yancey began to smell gas. (Tr. 1821-22 (Reily-Yancey).)

At approximately 3:00 p.m., Sushi Park employees began to smell gas while working in the restaurant kitchen. (Tr. 1516-17, 1589 (Sushi Park Employee Gomez ("Gomez")); Tr. 1606-09, 1625 (Sushi Park Employee Marquez ("Marquez")).) The employees turned off all gas valves for the kitchen and reported the smell to Kang, who was the manager at the time. (Tr. 1517-18, 1586-87, 1594 (Gomez); 1607 (Marquez).) Kang notified Hrynenko after smelling gas himself in the stairs leading to the basement. (Tr. 2399-2400, 2433-34, 2400-02, 2435 (Kang).) Hrynenko told Kang that she was going to send her son to him at the restaurant.[19] (Tr. 2400 (Kang).) Kang

---

[19] Patrons of Sushi Park who were dining at the restaurant around 3:00 p.m. on March 26, 2015, testified that they saw two men run towards the entrance of the restaurant, but only one of the two men ran into the back of the restaurant. (Tr. 2289-92 (Patron Paola Cardoza ("Cardoza"); Tr. 2316-17, 2329 (Patron Sara Tapang ("Tapang")); Tr. 4594-96 (Patron Teresa Galarce-Garcia ("Galarce-Garcia")).) Kang and Sushi Park employee Hugo Ortega Reyes ("Reyes") identified the man who ran inside as Michael Hrynenko. (Tr. 2400-03 (Kang); Tr. 2469, 2511 (Reyes).) One patron, Cardoza, further identified the men, stating that one man was of European descent, had a beard and goatee, dark brown, short hair and was slim, while the other man was also of European descent, same height and slim. (Tr. 2292 (Cardoza).)

testified that Michael Hrynenko went to the basement of 121, but then ran out of 121 towards the entrance of 119. (Tr. 2400-01 (Kang) ("So the landlord's son came to the store and he went to the office side to go down to the basement. But soon after he ran out and then he got outside the building.").) Prior to running out of the building, Michael Hrynenko did not say anything to Kang or give any warning to the Sushi Park patrons. (*Id.* 2402-03.)

## C.    The Explosion

Prior to the explosion, Gomez heard a "small noise, like very low" that he believed was coming from the basement. (Tr. 1519-20 (Gomez); Tr. 1610 (Marquez).) Immediately after hearing this noise, he was knocked down due to a "very strong" explosion. (Tr. 1521 (Gomez).) The video shows that the explosion occurred at 3:16 p.m. (People's Ex. 4 at 2:35 (15:16).) The explosion destroyed the restaurant and left many employees, patrons and pedestrians injured and struggling to find an exit. (Tr. 1520-22 (Gomez); Tr. 1611-12 (Marquez); Tr. 2293-94 (Cardoza); Tr. 2318 (Tapang); Tr. 2403-05 (Kang); Tr. 2470 (Reyes); Tr. 2737 (Sushi Park Employee Machindra Chongbang); Tr. 2886-87 (Bystander Haley Chen); Tr. 4057 (Sushi Park Employee Rajendra BK); Tr. 4597 (Galarce-Garcia).)

At approximately 3:30 p.m., the Fire Department responded to the fire at 121, including firefighters, Michael McPartland ("McPartland"), Marlon Sahai ("Sahai"), Matthew Cassidy ("Cassidy"), Edward Tierney ("Tierney") and John Dunne ("Dunne"). (Tr. 198 (McPartland); Tr. 151 (Sahai); Tr. 181-82 (Cassidy); Tr. 326 (Tierney); Tr. 1162-63 (Dunne).) The fire in the restaurant quickly spread and was described as 30 or 40 feet high with heavy black smoke. (Tr. 153, 160 (Sahai); 199, 204 (McPartland).) Three buildings, *i.e.*, 119 and 121, as well as 123 Second Avenue, caught on fire and were reduced to rubble. (Tr. 943 (Detective Cohen ("Cohen")).) In addition to

13

the numerous Sushi Park employees, Sushi Park patrons, bystanders and firefighters who were injured, the bodies of two individuals, Sushi Park employee Moises Locon and patron Nicholas Figueroa, were discovered three days after the explosion following a search and rescue. (Tr. 942-43, 954-56 (Cohen).) An autopsy showed that both deceased victims died from injuries caused by the explosion. (Tr. 1658-59, 1673-76, 1683-84 (City Medical Examiner Dr. Jay Stahl-Herz).)

## D.   The Investigation

The New York City Fire Department's Bureau of Fire Investigation and the New York City Police Department's Arson & Explosion Squad ("A&E") conducted a joint investigation into the explosion (Tr. 2666 (Fire Marshal Lindell ("Lindell")).) The investigators found several remnants of the gas system amidst the rubble and, Pacheco, as a cooperating witness, confirmed that what they found were remnants of the gas distribution system that he had helped install. (Tr. 982-85, 1146-47 (Cohen); Tr. 2005-06 (Pacheco); Tr. 3974 (Ducceschi); Tr. 1198 (Detective Dimare ("Dimare")).) Among the remnants recovered were the gas risers going up to the 121 apartments, the piping leading to the meter bars in the front of the 121 basement, the meter bars themselves and the piping from the manifold system. (Tr. 993-94, 1003, 1020-25, 1032-33 (Cohen); Tr. 1211-12, 1227-28 (Dimare).) From the manifold system, there were remnants of four ball shut-off valves without handles, and all of the valves were fully or at least substantially open. (Tr. 1026, 1031, 1034-35, 1096 (Cohen); Tr. 1213-17 (Dimare); Tr. 2682 (Lindell); Tr. 2852 (DOB Plumber Truelson ("Truelson")); Tr. 3600 (Dowdall).) Investigators were unable to recover the main shut-off valve. (Tr. 1090-91, 1132-33, 1146-47 (Cohen); Tr. 1263, 1278-79 (Dimare).)

14

On April 13, 2015, Fire Marshal Fletcher ("Fletcher") issued a report that deemed the fire "accidental," meaning that it was a non-intentional fire.[20] (Tr. 2661 (Lindell).) Fletcher reported that the fire originated from the kitchen on the first floor of 121 "in the vapors of ignitable gas, natural gas from an unspecified source." (Tr. 3487 (Fletcher).) However, in a different portion of the report, Fletcher noted that "[n]atural gas from the basement migrated to the first floor." (*Id.* 3488.) Fire Marshal Lindell opined that the explosion was caused by natural gas leaking from the basement, which then migrated up to the first floor and upper levels until it met an unknown heat source that triggered a combustion. (Tr. 2688-89 (Lindell).)

In June 2015, investigators from A&E contacted the federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") to assist in the investigation. (Tr. 2572 (Fire Investigator Mark Gratkowski ("Gratkowski")).) Gratkowski, a fire research engineer and certified fire investigator, recreated the 121 gas distribution system in the ATF fire research laboratory to determine how much gas was flowing into the building through the meter bars into the 121 basement and how long it would take for that gas to reach an ignitable concentration. (Tr. 2561-72, 2584-91, 2598-2611 (Gratkowski); Tr. 3934 (Ducceschi).) The outcome of Gratkowski's re-creation was similar to the outcome on the day of the explosion, with the gas taking between 12.8 and 24.3 minutes to explode.[21] (Tr. 2617 (Gratkowski).)

---

[20] Fire Marshal Lindell noted that there can be criminal liability, even if a fire is deemed accidental. (Tr. 2662 (Lindell).)

[21] On the day of the explosion, the gas distribution system in 119 was turned back on between 2:53 and 2:56 p.m. and caused an explosion in the 121 basement at 3:16 p.m., 20 to 23 minutes later. (Tr. 2619-20 (Gratkowski).)

Subsequently, the District Attorney's Office retained Thornton Tomasetti to perform an analysis of the available information and determine the cause of the explosion. (Tr. 2989-91, 3002-05 (Thornton Tomasetti Structural Engineer James Wesevich ("Wesevich").) Thornton Tomasetti, in turn, retained Gexcon, as a consultant to assist them. (*Id*. 3003 ("Gexcon provided the dispersion and ignition blast estimates for [Thornton Tomasetti's] study[.]").)

Thornton Tomasetti concluded that the 121 basement had been the site of a "vapor cloud explosion" of natural gas that led to a "vented deflagration." (Tr. 3068-69, 3089 (Wesevich); Tr. 3550-52 (Dowdall).) Gexcon concluded that the source of the gas release that triggered the vented deflagration was open meter bars in the 121 basement. (*Tr*. 3811 (Gexcon Mechanical and Aerospace Engineer Scott Davis ("Davis")).) Davis opined that "there was restriction of gas to open isolation valves, to open meter bars, which basically resulted in a catastrophic release in the [121] basement which, in the timeframes we are talking about, people smelled and then eventually ignited and caused a large deflagration slash explosion."[22] (*Id*. 3768.)

---

[22] According to Davis, a deflagration occurs when a flame burns at subsonic speed through a flammable or vapor cloud. (Tr. 3729 (Davis).)

16

**III.    Relevant State Court Proceedings**

   **A.    Trial**

   Commencing on September 9, 2019, Kukic and Hrynenko were tried by jury before Justice Michael Obus.[23] (Tr. 1.) A summary of the trial testimony from the prosecution witnesses is set forth in Background Section II, *supra*.

   In the midst of the prosecution's case, on October 24, 2019, a juror favored by the defense ("Juror No. 2") requested to be excused for one day on October 29, 2019, to appear for a job interview in Albany, New York, that she could not reschedule due to already having rescheduled at the trial court's request. (Tr. 4367-68.) After an inquiry into Juror No. 2's availability, the trial judge discharged Juror No. 2 pursuant to New York Criminal Procedure Law ("N.Y. CPL") § 270.35, over the defense's objection, finding that discharge was appropriate where the juror was unavailable for service for more than two hours. (Tr. 4373-76.)

   After the close of the prosecution's case, on November 17, 2019, the defense called as an expert witness Thomas Mohnal ("Mohnal"), a former agent with the Federal Bureau of Investigation ("FBI"), who had worked for the FBI for over 30 years, mainly in the laboratory explosives unit.[24] (Tr. 4653-54 (Mohnal).) Mohnal opined that the source of the gas that caused the explosion was the kitchen on the first floor of 121 because employees and patrons of Sushi Park testified that they had smelled gas in, and heard a hissing sound coming from, the kitchen

---

[23] Ioannidis also was a defendant at the trial and, like Kukic and Hrynenko, also was found guilty. (Tr. 5332-33.)

[24] Mohnal had no experience with natural gas explosions and had no experience investigating flow rates of natural gas. (Tr. 4672 (Mohnal).) In addition, he testified that he never had been qualified as an expert in natural gas explosions and never had investigated a gas cloud explosion. (*Id.* 4673, 4752.)

17

area and, as Mohnal testified, a "hissing sound is indicative of a leak." (*Id.* 4678-79, 4742.) He stated that the explosion could have resulted from a gas leak that built up over time in a first-floor kitchen appliance and related piping. (*Id.* 4805.) He further opined that the explosion did not start in the basement because of the lack of damage in the basement to several items such as the water heater and "bilco" doors leading from the basement to the sidewalk compared to the considerable damage to the restaurant on the first floor. (*Id.* 4683, 4706-07, 4794.) Following Mohnal's testimony, after certain stipulations were entered into the record, the defense rested without calling any other witnesses. (*Tr.* 4917.)

On November 15, 2019, the jury convicted Kukic and Hrynenko of two counts of manslaughter in the second degree, nine counts of assault in the second degree, four counts of assault in the third degree and one count of reckless endangerment in the second degree. (Tr. 5327-30, 5333-35.)

### B.   Post-Trial Motion

On January 14, 2020, Kukic and Hrynenko moved to set aside the verdict pursuant to New York CPL § 330.30(1), arguing that the trial court had abused its discretion when it discharged Juror No. 2. (Defs.' Mot., 22-CV-02684 ECF No. 1-3, at PDF pp. 19-22.) On January 17, 2020, Justice Obus denied the motion. (Tr. 5349-53.)

### C.   Sentencing

On January 14, 2020, Justice Obus sentenced each of Kukic and Hrynenko to an aggregate term of 4 to 12 years. (Tr. 5393-94.)

## D.   Direct Appeal

Kukic and Hrynenko appealed their convictions to the Supreme Court of the State of New

York, Appellate Division, First Department, raising three claims: (1) that the evidence was legally

insufficient to support their convictions; (2) that the verdict was against the weight of the

evidence; and (3) that the trial court improperly dismissed Juror No. 2. (Pet.'s App. Div. Br., 22-

CV-02684 ECF No. 11-2, at 4.) On June 22, 2021, the Appellate Division unanimously affirmed

their convictions. *See Kukic*, 196 A.D.3d at 177.

With respect to legal sufficiency and weight of the evidence, the Appellate Division held:

Under the well established principles pertaining to legal sufficiency and weight of
the evidence review . . ., there is no reason to disturb the verdicts. Defendants'
convictions for second-degree manslaughter required proof that defendants
"recklessly cause[d] the death of another person" (Penal Law § 125.15 [1]). A
person acts recklessly with respect to another person's death when he or she "is
aware of and consciously disregards a substantial and unjustifiable risk that [the
death] will occur," and the risk is "of such nature and degree that disregard
thereof constitutes a gross deviation from the standard of conduct that a
reasonable person would observe in the situation" (Penal Law § 15.05 [3]).
Second- and third-degree assault and reckless endangerment also require the
mental state of recklessness. To warrant a finding that defendants caused a death,
it was not necessary to find that they intended the death . . .. It will suffice if it can
be said beyond a reasonable doubt that the death was "something which should
have been foreseen as being reasonably related to [defendants'] acts" . . ..

Viewed in the light most favorable to the People . . ., the evidence was legally
sufficient to prove that defendants recklessly caused the victims' deaths when
they deliberately circumvented safety regulations to create and operate the
unauthorized system that diverted natural gas from the building at 119 Second
Avenue to the apartments in the building at 121 Second Avenue. Contrary to
defendants' primary argument, the explosion was a foreseeable result of their
actions. There was ample evidence that defendants, who both had ample
experience with buildings and the relevant DOB and Con Ed regulations,
understood the risk that death would occur when they proceeded with building
and operating the unauthorized gas delivery system . . .. However, Hrynenko
needed a gas delivery system to enable her to immediately begin collecting rent
for the apartments at 121, so she chose not to wait for Con Ed's permitting and
inspection process to be completed for the authorized system and instead had

19

Kukic build an unauthorized and dangerous makeshift system, using unlicensed plumbers, which they hid from Con Ed. The record shows that defendants both had active roles throughout the planning, building and operation of the system.

Defendants' claims that they reasonably relied upon Pacheco's assurances about the safety of the system are unavailing. Although Pacheco testified that, at the time, he did not believe that the system he and Ioannidis built was dangerous, there was no evidence that he made assurances to defendants about its safety. Moreover, even if Pacheco had made assurances to them, it would not have been reasonable for them to rely on those assurances, given that they knew that the system, which Pacheco helped build with another unlicensed plumber, was unauthorized. Indeed, the first unauthorized system for providing gas to the apartments at 121 had resulted in a gas leak, and yet defendants decided to use the same personnel to create the second unauthorized system.

Nor were the verdicts against the weight of the evidence. Although defendants' expert testified that the explosion occurred in the first-floor restaurant due to a leak in a kitchen appliance, the jury was entitled to reject that testimony and credit the testimony of the People's expert . . ., who testified that a massive volume of gas escaped from the open meter bars in the unauthorized system, ignited in the basement of 121, and followed a path up the stairs to the first-floor restaurant, then out the front of the building.

*Kukic*, 196 A.D.3d at 175-76 (case law citations and footnote omitted).

With respect to Juror No. 2, the Appellate Division held:

The court providently exercised its discretion in replacing a juror with an alternate after a sufficient inquiry into the juror's unavailability. The juror's necessary absence would have interrupted the trial for a full day, much longer than the statutory two hours. The juror had a critically important appointment for a career-related examination, which she had already rescheduled because of the trial and could not reschedule again. Missing the examination would have caused her "compelling hardship, rather than mere inconvenience".

*Id.* at 176-77 (citations omitted).

On November 10, 2021, the New York Court of Appeals denied Kukic's application for

leave to appeal, *see People v. Kukic*, 37 N.Y.3d 1097 (2021), and also denied Hrynenko's

application. *See People v. Hrynenko*, 37 N.Y.3d 1096 (2021).

## IV.   **Habeas Petitions**

In their Petitions,[25] Kukic and Hrynenko challenge their convictions on two grounds: (1) they were deprived of due process based upon legal insufficiency of the evidence at trial, and (2) the trial court violated their Sixth Amendment rights by discharging a juror. (*See* Baker Decl. ¶¶ 170-75; Hrynenko Pet. at 5-7.) On January 31, 2023, oral argument was held on the pending Petitions. (*See* 1/31/23 Tr., ECF No. 21.)

## **LEGAL STANDARDS**

### I.   **AEDPA Generally**

Under 28 U.S.C. § 2254(a), as amended by AEDPA, a person in custody pursuant to a state court judgment only may prevail on an application for a writ of habeas corpus on the ground that his or her custody violates "the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petitioner must show that the state court decision, having been adjudicated on the merits, is either "contrary to, or involved an unreasonable application of, clearly established Federal law" or is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). For the purposes of federal habeas review, "clearly established law" is defined as "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

---

[25] By Memo Endorsement, dated November 9, 2022, Kukic's and Hrynenko's cases were consolidated. (*See* 11/9/22 Mem. End., 22-CV-02684 ECF No. 17, 22-CV-09075 ECF No. 7.) Hrynenko adopts and incorporates the arguments in support of the issues raised by Kukic in his Petition. (*See* Mischel Decl., 22-CV-09075 ECF No. 3, at PDF p. 18.)

21

A state court decision is "contrary to," or an "unreasonable application of," clearly established law if it: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Williams*, 529 U.S. at 412-13. The state court decision must be "more than incorrect or erroneous;" it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). AEDPA "dictates a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal quotation marks and citations omitted).

## II.   **Sufficiency Of The Evidence**

"The Due Process Clause prohibits conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged.'" *Fashaw v. Griffin*, No. 17-CV-07328 (KPF), 2020 WL 6482924, at *13 (S.D.N.Y. Nov. 4, 2020) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). "In a challenge under 28 U.S.C. § 2254 to the evidentiary sufficiency of a state criminal conviction, [the Court] review[s] the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (citing *Jackson v. Virginia*, 443 U.S. 307, 317 (1979)); *see also Coleman v. Johnson*, 566 U.S. 650, 656 (2012) ("[T]he only question under *Jackson* is whether [the jury's verdict] was so insupportable as to fall below the threshold of bare rationality.").

22

"[W]here the state courts have decided a habeas petitioner's legal sufficiency claim on the merits, [ ] this Court must review that claim under a 'doubly deferential standard of review.'" *Fashaw*, 2020 WL 6482924, at *13 (quoting *Garbutt v. Conway*, 668 F.3d 79, 81-82 (2d Cir. 2012)). The Court "defer[s] first to the jury's verdict, drawing all inferences in its favor." *Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012) (citing *United States v. Archer*, 671 F.3d 149, 160 (2d Cir. 2011)). "Second, [the Court] defer[s] to the state courts' rejection of the defendant's constitutional arguments, at least insofar as it did not result from an unreasonable determination of the facts or an unreasonable application of clearly established federal law. *Id.* (citing *Garbutt*, 668 F.3d at 81). Thus, where the state courts have denied a claim of insufficient evidence on the merits, the writ should not be granted unless "*no* reasonable court could have held that *any* reasonable jury could have read the evidence to establish petitioner's guilt beyond a reasonable doubt." *Garbutt*, 668 F.3d at 82 (emphasis in original); *see also Scott v. Graham*, No. 16-CV-02372 (KPF) (JLC), 2017 WL 2820061, at *20 (S.D.N.Y. June 29, 2017), *report and recommendation adopted*, 2018 WL 5257613 (S.D.N.Y. Oct. 22, 2018) (petitioner challenging sufficiency of evidence to support state-court conviction "bears a very heavy burden").

It is not the role of a federal court in considering a habeas petition to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19 (emphasis in original). Further, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011). "Because rational people can sometimes disagree . . . judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id.*

23

## DISCUSSION

**I.** **The Appellate Division's Determination Regarding Sufficiency Of The Evidence Was Not Contrary To Or An Unreasonable Application Of Clearly Established Federal Law**

**A.** **Elements Of Crimes**

"When considering the sufficiency of the evidence of a state conviction, '[a] federal court must look to state law to determine the elements of the crime.'" *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999) (citing *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002)). Kukic and Hrynenko each were convicted in New York state court of manslaughter in the second degree, assault in the second degree, assault in the third degree and reckless endangerment in the second degree. (Tr. 5327-30, 5333-35.) Under New York law, "[a] person is guilty of manslaughter in the second degree when . . . [h]e recklessly causes the death of another person[.]" N.Y. Penal Law § 125.15(1). "A person is guilty of assault in the second degree when . . . [h]e recklessly causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument[.]" NYPL § 120.05(4). "A person is guilty of assault in the third degree when . . . [h]e recklessly causes physical injury to another person[.]" NYPL § 120.00(2). "A person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person." NYPL § 120.20.

Petitioners argue that there was insufficient evidence at trial to prove foreseeability and recklessness. (*See* Kukic Mem., 22-CV-02684 ECF No. 1-4, at 19-43; Mischel Decl. ¶ 17 (Hrynenko adopting Kukic's arguments).) Thus, the Court addresses these elements herein.

With respect to foreseeability, under New York law, a defendant's conduct will be found to be "a sufficiently direct cause" of harm if "the ultimate harm is something which should have been foreseen as being reasonably related to the acts of the [defendant]." *People v. Kibbe*, 35

24

N.Y.2d 407, 412 (1974). With respect to recklessness, "[a] person acts recklessly with respect to [the death of another person] . . . when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." NYPL § 15.05(3).

## B. **Petitioners' Contentions Regarding Sufficiency Of Evidence**

Petitioners contend that the Appellate Division's decision is contrary to, or involved an unreasonable application of, clearly established federal law, as articulated by the Supreme Court in *Jackson v. Virginia*, and that it is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. (*See* 1/31/23 Tr. at 2-3.) Specifically, Petitioners contend that, because the prosecution failed to identify the source of the ignition which resulted in the gas explosion, there was insufficient evidence to establish that Petitioners could have foreseen the explosion in the manner that it occurred. (*See* Kukic Mem. at 19-20.) Petitioners further contend that Pacheco's testimony "clearly undermined any finding of recklessness" (*see* Kukic Mem. at 33), and that Petitioners "had an absolute right to rely upon Pacheco's belief in the safety of the system, thereby precluding any finding of recklessness." (*See* Baker Decl. ¶ 173.) During oral argument, Petitioners argued that, other than Pacheco's testimony, there was no evidence in the trial record regarding "what Hrynenko and Kukic knew" regarding the risks of the gas system that was installed. (*See* 1/31/23 Tr. at 8; *see also id.* at 6 (other than Pacheco testimony, "there is no other testimony, no other evidence reflecting on risk awareness or perception").)

25

**C.    Appellate Division Decision**

The Appellate Division addressed the sufficiency of the evidence with respect to both foreseeability and recklessness.[26] The Appellate Division held that "the evidence was legally sufficient to prove that [Kukic and Hrynenko] recklessly caused the victims' deaths when they deliberately circumvented safety regulations to create and operate the unauthorized system that diverted natural gas from the building at 119 Second Avenue to the apartments in the building at 121 Second Avenue." *Kukic*, 196 A.D.3d at 175. The Appellate Division further held that "[t]here was ample evidence that defendants, who both had ample experience with buildings and the relevant DOB and Con Ed regulations, understood the risk that death would occur when they proceeded with building and operating the unauthorized gas delivery system." *See id*. at 176.

The Appellate Division found that "the explosion was a foreseeable result of [Petitioners'] actions" and that Petitioners' "claims that they reasonably relied upon Pacheco's assurances about the safety of the system [were] unavailing." *Kukic*, 196 A.D.3d at 175-76. The Appellate Division held that,"[a]lthough Pacheco testified that, at the time, he did not believe that the system he and Ioannidis built was dangerous, there was no evidence that he made assurances to defendants about its safety" and that, "even if Pacheco had made assurances to them, it would not have been reasonable for them to rely on those assurances, given that they knew that the system, which Pacheco helped build with another unlicensed plumber, was unauthorized." *Id*. at 176.

---

[26] Kukic initially had stated that deference to the Appellate Division's determination regarding foreseeability "was not even required" because "the Appellate Division did not address it." (*See* Baker Decl. ¶ 172; *see also* ¶ 164 (Appellate Division "failed to address the claim that the element of foreseeability was lacking evidential support.").) However, Kukic's counsel later filed a letter rescinding these statements as "clearly erroneous." (*See* 7/5/22 Baker Ltr., 22-CV-02684 ECF No. 14.)

### D.  Analysis

The Court separately considers the sufficiency of the evidence regarding foreseeability and recklessness.

#### 1.  Foreseeability

Petitioners' central tenet regarding foreseeability is that "the People's proof failed to establish the actual source of ignition resulting in insufficient proof of foreseeability." (See Kukic Mem. at 3; Mischel Decl. ¶ 17 (Hrynenko adopting Kukic's arguments).) A review of the evidence offered by the prosecution at trial, however, shows that the Appellate Division's determination regarding the sufficiency of the evidence of foreseeability was not unreasonable.

Petitioners installed an admittedly unauthorized gas delivery system in the 121 basement. (See 1/31/23 Tr. at 5 (Petitioners' counsel referring to "unauthorized gas delivery system").) The individual who installed the system testified that it was flawed because, if the shut-off valve (from which the handle was removed) was turned on and the gas from 119 was turned on, gas would flow through the uncapped meter bars into the basement of 121. (Tr. 1951-52, 2128 (Pacheco).) Removing the handle of the shut-off valve further exacerbated the dangerousness of the unauthorized system, preventing the user "from being able to figure out which way gas is flowing." (Tr. 1029-30 (Cchen).)

The prosecution presented witness testimony that, when natural gas mixes with air at certain concentrations, it can ignite from even a small spark and cause an explosion. (See ~r. 673, Tr. 776 (DeLuca); Tr. 1736-37 (Diecidue); Tr. 2582-83 (Gratkowski); Tr. 3000 (Wesevich).) The experts who testified at trial on behalf of the prosecution concluded that the 121 basement had been the site of a "vapor cloud explosion" of natural gas that led to a "vented deflagration." (See

27

Tr. 3068-69, 3089 (Wesevich); Tr. 3550-52 (Dowdall).) The experts testified that the source of the gas release that triggered the vented deflagration was open meter bars in the 121 basement.[27] (See Tr. 3811 (Davis); Tr. 3611 (Dowdall).) They opined that the main shut-off valve between the 119 and 121 buildings had been open, leading gas to flow through the open valves in the manifold out the open meter bars into the front of the 121 basement, after which the gas mixed with air to reach an explosive concentration and was ignited by a spark that could have been generated by numerous items in the basement area, including the water heater, refrigerator and condensing unit for the walk-in freezer.[28] (See Tr. 3610-11 (Dowdall); Tr. 3767-68 (Davis).) This evidence supports the reasonableness of the Appellate Division's determination that "the explosion was a foreseeable result of [Petitioners'] actions." See Kukic, 196 A.D.35 at 175-76.

At bottom, Petitioners' challenge to the legal sufficiency of the evidence regarding foreseeability is a challenge to what inferences may be drawn from the prosecution's evidence and the credibility of trial witnesses, including the prosecution and defense experts. However, "[a]ll inferences from the evidence must be drawn in favor of the prosecution and the jury's assessment of the credibility of witnesses may not be second-guessed." Copeland v. Walker, 258 F. Supp. 2d 105, 118 (E.D.N.Y. 2003) (citing Bossett v. Walker, 41 F.3d 825, 830 (2d Cir. 1994)); see also id. ("a federal habeas court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier

---

[27] According to the expert testimony presented, the open meter bars connected to the large 119 commercial gas meter constituted the only piping capable of putting out the massive gas release needed for the substantial explosion that occurred. (See Tr. 3584, 3707-09 (Dowdall); Tr. 3742-43, 3749-51 (Davis).)

[28] The prosecution experts rejected the opinion of Petitioners' expert, Mohnal, that the explosion could have originated in the first-floor restaurant kitchen. (See Tr. 3123, 3134-35 (Wesevich); Tr. 3694-95 (Dowdall); Tr. 3765, 3906-07 (Davis).)

of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution"

(cleaned up) (citations omitted). As the Appellate Division found, "the jury was entitled to . . .

credit the testimony of the People's expert[s] . . . that a massive volume of gas escaped from the

open meter bars in the unauthorized system, ignited in the basement of 121, and followed a path

up the stairs to the first-floor restaurant, then out the front of the building." *Kukic*, 196 A.D.3d at

176.

Based upon all the foregoing, the Appellate Division's decision regarding foreseeability is

not contrary to, and did not involve an unreasonable application of, clearly established federal

law. Nor is the Appellate Division's decision based on an unreasonable determination of the facts

in light of the evidence presented at trial.[29]

### 2. Recklessness

At oral argument, Petitioners' counsel argued that Pacheco's trial testimony was the only

evidence regarding Petitioners' "risk awareness" or "risk perception" and that such evidence was

insufficient to prove that Petitioners acted in a reckless manner. (*See* 1/31/23 Tr. at 5-7.) In their

written submissions, Petitioners argue that the testimony of Pacheco, who was involved in

---

[29] In their legal memoranda, Petitioners rely on state court decisions which they argue support their arguments regarding the insufficiency of evidence of foreseeability. (*See* Kukic Mem. at 3 (citing *People v. Warner-Lambert*, 51 N.Y.2d 295 (1980) and *People v. Roth*, 80 N.Y.2d 239 (1992)).) However, "[i]n cases challenging the sufficiency of the evidence supporting a state-court criminal conviction, [the federal court's] concern is not with the state courts' application of the state law defining the offense but rather with the state courts' application of federal law, and, in particular, the sufficiency standard set forth by the Supreme Court in *Jackson v. Virginia* . . .." *Epps*, 687 F.3d at 50. "Under this standard, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (citing *Jackson*, 443 U.S. at 319). Here, as set forth above, a rational trier of fact could have found foreseeability beyond a reasonable doubt.

29

installing the gas system, "undermined any finding of recklessness." (*See* Kukic Mem. at 33; Mischel Decl. ¶ 17 (Hrynenko adopting Kukic's arguments).)

The Appellate Division expressly addressed Petitioners' arguments regarding both risk and Pacheco's testimony. With respect to Petitioners' risk awareness, the Appellate Division held that "[t]here was ample evidence that [Petitioners], who both had ample experience with buildings and the relevant DOB and Con Ed regulations, understood the risk that death would occur when they proceeded with building and operating the unauthorized gas delivery system." *Kukic*, 196 A.D.3d at 176. With respect to Pacheco's testimony, the Appel ate Division found that, "even if Pacheco had made assurances to [Petitioners about the safety of the gas delivery system], it would not have been reasonable for them to rely on those assurances, given that they knew that the system, which Pacheco helped build with another unlicensed plumber, was unauthorized" and that "the first unauthorized system for providing gas to the apartments at 121 had resulted in a gas leak." *Id.* at 176.

The Appellate Division's determination that, based upon the "ample evidence" of Petitioners' "experience with buildings and the relevant DOB and Con Ed regulations," Petitioners "were aware of the risk that death would occur when they proceeded with building and operating the unauthorized gas delivery system," *see Kukic*, 196 A.D.3d at 176, was not objectively unreasonable. As the Appellate Division noted, Petitioners "both had active roles throughout the planning, building and operation of the system" using unlicensed plumbers, which system was hidden from Con Ed, and in circumstances where a prior unauthorizec system using the same personnel resulted in a gas leak. *See id.*

Viewing the record evidence set forth in Background Section II, *supra*, in the light most favorable to the prosecution, the evidence reflects that Hrynenko, an experienced landlord, hired Kukic, an experienced contractor, to install a makeshift natural gas delivery system in the basement of her 121 building using unlicensed plumbers without obtaining regulatory approval from Con Ed because Hrynenko was anxious to rent out upper-floor apartments that did not have gas service. Given their experience, and based upon common knowledge, Hrynenko and Kukic were aware of the inherently dangerous nature of a natural gas delivery system.[30] The first system that was installed had a leak, and a red tag was issued by Con Ed for a leak in illegal piping. Around this time, Hrynenko and Kukic met in the basement of the adjacent 119 building owned by Hrynenko with two unlicensed plumbers and Hrynenko agreed to a new gas delivery plan for the subject upstairs apartments using the gas meter in the 119 building. Those plumbers then installed the new system without telling Con Ed about it. The new system functioned for about eight months, until a scheduled Con Ed visit to the 121 building in March 2015, when the system was turned off in order to keep it hidden from Con Ed.[31]

On the day of the fatal explosion, on March 26, 2015, Kukic turned the gas system off before the visit by Con Ed's representatives and turned it back on after the Con Ed

---

[30] At oral argument, even Petitioners' counsel admitted that "[e]verybody knows that a gas delivery system is going to be dangerous." (*See* 1/31/23 Tr. 12). These systems are dangerous because, at certain concentrations, gas is both flammable and explosive. (Tr. 673, 776 (DeLuca).) "To protect life and property," Con Ed regulates the installation of natural gas services and responds to gas emergencies by implementing safety measures, including evacuation of buildings. (Tr. 530, 582 (Velez).)

[31] Petitioners argue that the unauthorized system was safe because there were no incidents for eight months. (*See*, *e.g.*, 1/31/23 Tr. at 7 ("This gas delivery system worked without incident for eight months.").) However, there is nothing in the record to suggest that the system was turned off and on during that time period. The prosecution presented evidence at trial to show that, on March 26, 2015, when the unauthorized system was turned off and on, the risks inherent in the system manifested themselves and resulted in the explosion.

representatives left. Kukic met with Hrynenko after he turned the system off and before he turned it back on. Shortly after Kukic turned the gas back on, Sushi Park employees began to smell gas, and the manager notified Hrynenko. Hrynenko did not call 911 or the Fire Department, but sent her son to investigate. Her son entered the basement of the 121 building, but quickly ran from the building without warning anyone before leaving. Thereafter, the explosion occurred.

The foregoing evidence shows that the Appellate Division's determination that Hrynenko and Kukic "were aware of the risk that death would occur when they proceeded with building and operating the unauthorized gas delivery system," *see Kukic*, 196 A.D.3d at 176, was a reasonable one. It was reasonable for the Appellate Division to conclude that both Hrynenko and Kukic were directly involved in creating the risks that caused the deaths that occurred as a result of the fatal explosion.

Moreover, the foregoing evidence belies Petitioners' assertion that Pacheco's trial testimony was the only evidence of Petitioners' risk awareness or risk perception. To be sure, Pacheco's testimony offers direct evidence regarding his personal interactions with Hrynenko and Kukic. But, the Court is not limited to consideration of Pacheco's testimony in performing its review of the sufficiency of the evidence. The Court also must consider the circumstantial evidence that is recited above. "This Circuit . . . has unequivocally rejected the view that circumstantial evidence is probatively inferior to direct evidence." *United States v. Brown*, 236 F.2d 403, 405 (2d Cir. 1956); *accord Miller v. Racette*, No. 11-CV-00426 (MAT), 2012 WL 1999490, at *9 (W.D.N.Y. June 4, 2012) (citing *Brown*). Based upon the totality of the evidence in the record, it cannot be said that the jury's decision regarding Petitioners' recklessness fell "below the

32

threshold of bare rationality." *See Coleman*, 566 U.S. at 656. Thus, applying the relevant legal standards, Petitioners' habeas claims regarding sufficiency of the evidence of Petitioners' recklessness should be denied.

## II.   Petitioners' Claims Regarding The Discharge Of Juror No. 2 Are Not Cognizable And, In Any Event, Lack Merit

Petitioners contend that the discharge of Juror No. 2, pursuant to N.Y. CPL § 270.35,[32] deprived them of their rights under the Sixth and Fourteenth Amendments. (*See* Kukic Mem. at 44; Mischel Decl. ¶ 18 (Hrynenko adopting Kukic's arguments).)

As Kukic himself recognizes,[33] review of the Appellate Division's disposition of a N.Y. CPL § 270.35 claim "is not within the scope of habeas corpus review." *See Newmark* 2020 WL 4719914, at \*2; *Retallack v. Demarse*, No. 15-CV-00135 (ALC) (JCF), 2015 WL 10682147, at \*2 (S.D.N.Y. June 8, 2015), *report and recommendation adopted*, No. 15-CV-00135 (ALC) (JCF), 2016 WL 1529909 (S.D.N.Y. Apr. 14, 2016) ("An allegation of improper discharge of a juror is generally an issue of state law not cognizable on habeas review.").

Even assuming, *arguendo*, that the discharge of Juror No. 2 presented a cognizable federal question for habeas review, Petitioners' claims regarding such discharge lack merit. "The Sixth Amendment protects the right of a criminal defendant to be tried by the jury that he or she

---

[32] N.Y. CPL § 270.35 states, in relevant part, "[i]n determining pursuant to this section whether a juror is unable to continue serving by reason of illness or other incapacity, or is for any other reason unavailable for continued service, the court shall make a reasonably thorough inquiry concerning such illness, incapacity or unavailability, and shall attempt to ascertain when such juror will be appearing in court. If such juror fails to appear, or if the court determines that there is no reasonable likelihood such juror will be appearing, in court within two hours of the time set by the court for the trial to resume, the court may presume such juror is unavailable for continued service and may discharge such juror."

[33] *See* Kukic Mem. at 44-45 (quoting *Newmark v. Keyser*, No. 19-CV-03611 (BMC), 2020 WL 4719914, at \*2 (E.D.N.Y. Aug. 13, 2020)).

33

participated in selecting;" however, that right "is not absolute." *Crawford v. Keane*, No. 00-CV-06672 (DC), 2001 WL 913947, at *7 (S.D.N.Y. Aug. 14, 2001) (citing *United States v. Hillard*, 701 F.2d 1052, 1056 (2d Cir. 1983) and *Dunkerly v. Hogan*, 579 F.2d 141, 150 (2d Cir. 1978)). "Courts have broad discretion to replace a juror at any time before the jury retires if there is reasonable cause to do so, and a reviewing court will only find abuse of that discretion where there is bias or prejudice to the defendant." *Rosario v. Bennett*, No. 01-CV-07142 (RMB) (AJP), 2002 WL 31852827, at *26 (S.D.N.Y. Dec. 20, 2002) (quoting *United States v. Purdy*, 144 F.3d 241, 247 (2d Cir. 1998)) (cleaned up). "Prejudice in this context exists where the discharge is without factual support, or for a legally irrelevant reason." *United States v. Arline*, 660 F. App'x 35, 39 (2d Cir. 2016) (citation omitted). "[S]ubstitution of an alternate juror for reasonable cause is the prerogative of the court and does not require the consent of any party." *United States v. Millar*, 79 F.3d 338, 342 (2d Cir. 1996) (citations omitted).

In the present case, the Appellate Division's determination that the trial court "providently exercised its discretion in replacing a juror with an alternate after a sufficient inquiry into the juror's unavailability," was not objectively unreasonable.[34] *Kukic*, 196 A.D.3d at 176-77. Thus, Petitioners' habeas claim regarding discharge of Juror No. 2 should be denied. *See Hughes v. Phillips*, 457 F. Supp. 2d 343, 368 (S.D.N.Y. 2006) (denying habeas claim based upon dismissal of juror under N.Y. CPL § 270.35); *see also Wheeler v. Phillips*, No. 05-CV-04399 (JFB), 2006 WL

---

[34] Petitioners make a novel argument that there is a split between the First and Second Departments of the Appellate Division that somehow implicates the Equal Protection Clause. (*See* 1/31/23 Tr. at 27-31.) However, it is not the province of this Court in a habeas proceeding to reexamine the Appellate Division's determination regarding N.Y. CPL § 270.35, *see DiGuglielmo v. Smith*, 366 F.3d 130, 137 (2d Cir. 2004) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions" (quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)), let alone to seek to resolve or otherwise address any split between different Departments of the Appellate Division on a state law question.

2357973, at *6-8 (E.D.N.Y. Aug. 15, 2006) (rejecting habeas claim where trial court dismissed juror who would be absent for one-and-one-half days and "time was important").

In any event, Petitioners have failed to demonstrate any prejudice that they suffered as a result of the dismissal of Juror No. 2, as required. *See Shepard v. Artuz*, No. 99-CV-01912 (DC), 2000 WL 423519, at *6 (S.D.N.Y. Apr. 19, 2000) (rejecting Petitioner's claim of improper discharge of juror because, "even assuming that the trial court erred in dismissing [the juror], petitioner [] failed to demonstrate prejudice") (citing *Wray v. Johnson*, 202 F.3d 515, 525 (2d Cir. 2000)); *Wheeler v. Phillips*, No. 05-CV-04399 (JFB), 2006 WL 2357973, at *6 (E.D.N.Y. Aug. 15, 2006) (holding that dismissal and replacement of jurors with alternates due to jurors' unavailability did not raise a constitutional issue because "[f]or example, there is no allegation that the replacement was biased, or that some constitutional infirmity ensued as a result of the court's decision"). "[T]he court merely replaced one impartial juror with another impartial juror, an action that surely cannot have deprived petitioner of his right to a fair trial." *Rosario*, 2002 WL 31852827, at *26 (quotations omitted).

Accordingly, Petitioners' claims regarding the discharge of Juror No. 2 should be denied.

## CONCLUSION

For the reasons set forth above, I respectfully recommend that the Petitions of Kukic and Hrynenko for a Writ of Habeas Corpus be DENIED.

Dated: February 28, 2023
New York, New York

Stewart d. Aaron

STEWART D. AARON
United States Magistrate Judge

35

*          *          *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Any requests for an extension of time for filing objections must be addressed to Judge McMahon.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140 (1985).